

Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
T  +1 212 918 3000
F  +1 212 918 3100
www.hoganlovells.com

April 29, 2022

**VIA ECF AND EMAIL**

The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        **RE:    United States v. Luis Enrique Martinelli Linares, 21 Cr. 65 (RJD)**

Dear Judge Dearie:

        We respectfully submit this letter on behalf of Luis Enrique Martinelli Linares ("Luis Martinelli"), whom the Court will sentence on May 20, 2022, for conspiracy to commit money laundering.

        Luis is many things:  devoted husband and father to two young daughters, successful businessman, valued friend, outdoorsman, and a soft-spoken, kind individual who always looks to help others.[1]  Luis is also currently incarcerated and, at the time of his sentencing, will have been for nearly 23 months for the conduct for which he is to be sentenced by the Court.  In the time since his arrest in July of 2020, Luis has accepted responsibility for his criminal conduct and has

---

[1] *See* Letter of Carolina Martinelli, Luis's sister (explaining that Luis is "[c]onstantly making sure the people around him are okay and looks for ways in which he can make everyone's life better"); Letter of Ivonne Matute de Martinelli, Luis's aunt ("He wins the hearts of those who know him for his people skills, his sympathy, and for being an inclusive person."); Letter of Ursula Barrantes-Tarafa (stating that she has "never met a real person with so big of a heart before" and that "there are not words to describe . . . my friend in Luis"); Letter of Andres Pages, Luis's friend since kindergarten (considers Luis both "friend AND family" and describes his lifelong friend as someone who is "always there" for his friends and who "has a gold heart").

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante Amsterdam Baltimore Beijing Birmingham Boston Brussels Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Moscow Munich New York Northern Virginia Paris Perth Philadelphia Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Warsaw Washington, D.C.  Associated Offices: Budapest Jakarta Riyadh Shanghai FTZ Ulaanbaatar.  Business Service Centers:  Johannesburg Louisville.  Legal Services Center: Berlin.  For more information see www.hoganlovells.com

entered into a plea agreement with the government, which has been approved by the Court. He takes ownership of his mistakes and regrets them every day of his life. His remorse is heartfelt and true.[2]

Luis regrets his criminal behavior for a multitude of reasons, but none greater than the pain and suffering that his lapse in judgment has caused his wife, Marelisa, and his resulting absence in the lives of his young daughters, ██████████. Luis's actions, and the impact they have had on those he loves most, will forever weigh heavily on him. We respectfully ask the Court to sentence Luis to time-served (which equates to a sentence of almost 23 months and includes the more than 16 months he served in Guatemala and the over six months he will have served at the Metropolitan Detention Center in Brooklyn ("MDC") by the time of sentencing) and allow him to return to his family and strive to be the father that ██████████ need, and deserve.

## I.     LUIS'S PERSONAL BACKGROUND

Luis was born in Panama City, Panama, on December 16, 1981. Just a few months ago, he spent his 40th birthday in the basement of 225 Cadman Plaza East, in handcuffs, while being interviewed by a Senior U.S. Probation Officer of the United States Probation Department as part of the presentence investigation.

The beginning of Luis's childhood was what one would describe as normal. The family was of modest means and lived in a small house in a nice neighborhood. His mother was very supportive of Luis, and always helped him with tasks related to school and homework. His father,

---

[2] *See* Letter of Rev. Ngozi Osuji, Chaplain at the Metropolitan Detention Center ("Mr. Martinelli comes across to me as deeply penitent of the errors that brought him behind bars and wishes he could reverse the hands of the clock. To say he is deeply repentant is an understatement."); Letter of Marelisa Garuz, Luis's wife ("Luis immensely regrets his mistakes and I know he has learned from them since I can see how he is suffering."); Letter of Marta L. de Martinelli, Luis's mother ("[Luis and Ricardo] regret every day of their lives this terrible mistake. . . ."); Letter of Gonzalo Cano Gonzalez, Chaplain Priest of the penitentiary system of Guatemala ("[Luis and Ricardo] show repentance and wish to be better people in the future.").

Ricardo Martinelli Berrocal, was a workaholic who was not as present in Luis's life; he saw his father infrequently.  Luis describes his father as an incredibly hard worker, and even when Luis was young, his father's primary goal was creating a better life for their family through working long, difficult hours away from the family.

The singularity of this focus only increased when, in 1986, Mr. Martinelli Berrocal purchased a supermarket chain, known then as Almacen 99 and now as Super 99.  Under Mr. Martinelli Berrocal's leadership, the profitability and scale of the supermarket business skyrocketed.  Owing to the business's success, the Martinelli family moved to a new, larger home in a nicer neighborhood, when Luis was seven years old.

Nevertheless, as the family's wealth and prominence grew, so did the absence of Luis's father from his daily life.  As a youth, Luis did not know his father well and did not see him often.  When he was home, Mr. Martinelli Berrocal was a disciplinarian who parented with a very strict method of control and authority over his children.  Luis's relationship with his father was characterized by an often unforgiving attention to perfection, a trait that led Luis to both fear and idolize his father.  There was little question that Mr. Martinelli Berrocal was the decisionmaker in the family, and his orders and instructions were always followed.  This dynamic between father and son continued into adulthood for Luis and permeated both Luis's professional and personal lives.

Despite their complicated relationship, Mr. Martinelli Berrocal served as Luis's role model, and Luis constantly sought his father's approval.  Luis understood that he could only win his father's approval through hard work, a characteristic that his father valued and instilled in him

from an early age.  Starting when he was approximately 11 years old, Luis spent his childhood and teenage summers working in the Super 99 stores, assembling bicycles and fixing toys.[3]

The approval and attention that Luis received from his father while working in the Super 99 stores during his adolescence motivated Luis to join the family business full-time when he grew up, and it was with this ultimate goal in mind that he enrolled at Southern Methodist University ("SMU") in Dallas, Texas, in August of 2000, to earn a degree in Business Administration.  While at SMU, Luis dove headfirst into his studies.  Carlos Jelenszky, an SMU classmate and close friend of Luis's, recalls how Luis "studied and worked his tail off" while in college.  Letter of Carlos Jelenszky.  Even as a young college student, Luis had an impressive maturity and humility that his friends admired:

> He didn't take anything for granted.  I always admired that…somebody that could coast through college without worrying about his future but instead was actually extremely dedicated to his studies.  Another thing I recall from our college days that speaks to Quique's[4] character, was the fact that he never flaunted his wealth.  I know this sounds like nothing out of the ordinary, but within the context of a college society where everybody was keen on showing off, Quique was quite the opposite.  At an age when appearances were everything, his humility spoke volumes.

*Id.*

Following his graduation from SMU in 2004, Luis returned to Panama, eager to begin his work at Super 99.  However, at the direction of his father, Luis first went to work at Banco America Central de Panama ("Bac Panama") in Panama City, Panama, as a commercial loan officer.  Following two years in his role at Bac Panama, an experience Luis deeply values, he received approval from his father to join Super 99.

---

[3] "Since they were young my sons worked (as training) in the supermarket during their vacations from school."  Letter of Marta L. de Martinelli.

[4] "Quique" is a nickname that Luis's close friends and family sometimes call him.

4

## II.      SUCCESS & CHARACTER IN BUSINESS

In 2006, Luis began working at Super 99 in the purchasing department.  His responsibilities included the purchasing of goods from companies in the United States for sale in Super 99's supermarkets, as well as acquiring property on behalf of the company for the construction of new Super 99 supermarket branches.  While Luis enjoyed the business aspect of his new role, more important to him than the substance of the job was the time spent with his father, as the two worked very closely together from 2006 until 2009.

In 2009, Mr. Martinelli Berrocal was elected President of Panama.  Following the election, Luis's father made Luis the president and legal representative of Super 99, and all related companies, in his stead.  Luis's father's faith in him to lead the company meant the world to Luis. Eager to demonstrate his value to his father, Luis embraced his new leadership role and quickly continued his father's passion for Super 99 and dedication to its success.[5]  In doing so, Luis was incredibly successful in running the family business.  In the more than six years that Luis was at the helm, the company's size nearly doubled, with an average of four or five new Super 99 branches opening within Panama every year.  Beyond that, Luis completely modernized the company, upgrading its technological platform and bringing it fully into the modern era, setting it up for success for years to come.

### A.      Good Deeds Within Super 99

Even while taking Super 99 to new heights, Luis maintained a thoughtful, caring managerial style towards his employees and remained the considerate, empathetic person that he always was, and remains to this day.  *See* Letter of Dania Jaén, Luis's former assistant at Super 99 ("I can say he is a wonderful person and an excellent boss.  He worried for his employees'

---

[5] *See* Letter of Maribel Adames de Garuz, Luis's mother-in-law (explaining that Luis "stood up to the standards" of the "high expectations his family had on him").

wellbeing and he treated us with amiability and respect.  He treated us like family."); *see also* Letter of Jaime Néstor Trujillo Castillo, Security Director of Super 99 ("While he was president and general manager of Super 99 he was always willing to help his employees with whichever problem they may have.").  Notably, one of the first new policies that Luis implemented as president of the company was to give free health insurance to all 6,000 Super 99 employees.  He also greatly expanded an existing Super 99 policy whereby any employee could receive a loan from the company with zero interest.  It was important to Luis that his employees were looked after financially.

As president of Super 99, Luis did not just build new grocery stores.  Indeed, Luis commissioned the building of Complejo Deportivo Super 99 (Super 99 Sports Complex), which consists of large, expansive sporting facilities complete with soccer fields, volleyball courts, a baseball field, a pool, and other resources for Super 99 employees and their families to use free of charge.  While president of Super 99, Luis often participated in the employee recreational sports leagues that the company hosted at the facilities, in addition to other events organized by his employees.  *See* Letter of Dania Jaén (discussing how Luis organized the creation of Complejo Deportivo so that "workers could spend quality time with their families" and that Luis "even played and participated in the leagues himself").  Complejo Deportivo Super 99 also included a large, fully-equipped event space that was available for any Super 99 employee to use, for no cost, to host weddings, birthday parties, and all kinds of events.

While president of the company, Luis also founded the Escuelita Luis Enrique Martinelli, a free soccer school for children of Super 99 employees.  The school, created by Luis, was fully-funded by Super 99 and open to children of all employees.  The free classes took place every Saturday morning at the Complejo Deportivo Super 99 soccer fields and were led by a former

professional soccer player from the Panamanian Men's National Team.  As is obvious, Luis was dedicated to creating a positive working environment for his employees and wanted to ensure that all members of the Super 99 family felt respected and valued.

Importantly, Luis allocated not only the Company's resources towards the well-being and happiness of his employees, but his own as well, consistently demonstrating concern and care for those who worked for the company.  In a letter to the Court, Yulin Aimee Perivancich Carreiro, a former employee of Super 99 for nearly two decades, recounts how Luis helped her pay for ▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆  *See* Letter of Yulin Aimee Perivancich Carreiro.  And thoughtful, generous acts such as these were not out of the ordinary; they simply show who Luis is as a person.  *See id.* ("If I could use one word to describe him, it will be humanitarian.").  As Ms. Perivancich Carreiro explained, Luis "didn't hesitate to help every employee that needed it," *id.*, a statement that is readily corroborated by the accounts of other former Super 99 employees.  For example, in her letter, Dania Jaén, writes about Luis's acts of generosity not only towards her, but to other former colleagues as well:

> It should be noted the case of a coworker who had serious health issues.  Luis personally took care of following up on his treatment and offered him all the attention he needed.  Sadly he died, but thanks to the support he received from Luis he was able to life longer than was expected regardless of his diagnose.  Luis' help granted him more time to be with his wife and kids.  I also remember one time when he helped some of his coworkers who have had problems with their houses due to inclement weather.  He gave them the materials they needed to rebuild the part of their houses that got damaged.

Letter of Dania Jaén.

Jaime Néstor Trujillo Castillo similarly speaks of Luis's compassion toward his employees and the lasting positive impact that Luis has had on his life:

> Luis helped me while I was going through a very difficult crisis in my personal life.

He remained a steadfast supporter during this time in my life where I needed a true friend.  He was always near me, giving my family and me his continuous moral support.  I hold very high esteem of him as a boss but more importantly, as a person.

Letter of Jaime Néstor Trujillo Castillo.

The letters provided by Luis's former colleagues are telling, and are emblematic of the type of person Luis is, someone who selflessly volunteers his resources and his time to enrich the lives of others.

### B.    The Trend Continues With Sebra in the United States

After serving as president of Super 99 for more than six years, Luis realized that his family would benefit from a change and moved with Marelisa and ▆▆▆▆▆▆▆ was not yet born) to Miami, Florida, in October of 2015.  As part of the move, Luis gave up his role as Super 99's president and transitioned into a more advisory role as a director, a title he still holds to this day. After settling in the United States, Luis started a new business called Sebra, which purchases goods in the United States for Super 99 to sell in its grocery stores in Panama.  With Sebra up and running, Luis applied for and was granted an E-2 Investment Visa from the United States government based, among other things, on the fact that he had invested a substantial amount of capital into a U.S. business.  Sebra was, and remains, very successful, and Luis quickly hired several employees.  At Sebra, Luis established a collegial culture and utilized the same managerial style of treating colleagues like family as he had at Super 99:

[H]e has been able to reward his employees with excellent benefits, like a 401k plan and health insurance to new employees that did not have those benefits in the past. I have always looked at his business as a model for other companies to follow, since he has been able to start a profitable business where employees are valued and treated with respect.  On several occasions he authorized for his employees to receive additional education and training, I recall shortly after being hired, he offered for me to take Spanish language courses to facilitate me dealing with customers that only spoke Spanish.  On another occasion, there was conflict in the office between employees, and Luis organized a team building event that allowed everyone to come together, because for Luis, it was important that the environment

was not only successful in business, but that it was a good work environment for everyone.  It is easy to understand why Luis was always admired by people he engaged with professionally.

Letter of Jorge Chapas, a managing director at Sebra.

Prior to the expiration of their immigration status, Luis and Marelisa (as well as their two young daughters) were heavily involved in the community and quickly made many friends in the neighborhood.  Right away, Luis became very active in the local church.  Through his involvement, he "developed a pastoral and spiritual relationship" with Reverend Juan Carlos Paguaga, as the two "had the opportunity to share time after masses."  Letter of Rev. Fr. Juan Carlos Paguaga ("Even though [Luis] seems to have a quiet personality, he was not afraid to be there for others and engage in parish activities."); *see also* Letter from Ursula Barrantes-Tarafa (discussing elements of her close friendship with Luis and recalling how the two "met at church every Sunday at 11:30 AM," always one row behind each other, in Miami).  Even though their time there was short, Luis and his family had firmly established themselves as valued members of their local community in the United States, even beyond Luis's work-life at Sebra.  *See* Letter of Rev. Fr. Juan Carlos Paguaga (discussing Luis's "spiritual family that loves him and misses him much" at the church).

## III.    THE IMPORTANCE OF FAMILY TO LUIS AND THE IMPACT OF HIS CONDUCT ON THEM

It is clear that Luis is both a successful businessman and a leader held in high regard throughout the ranks of Super 99 and by those he employs at Sebra.  Nonetheless, above all else, Luis is a family man.[6]  Luis understands that his own actions are the cause of the suffering that his

---

[6] Letter of Jaime Néstor Trujillo Castillo ("He is a family oriented man, his family is very important to him."); Letter of Jorge Chapas ("Outside of the office, I was able to learn more about Luis and how he was in his personal time. When he wasn't working, he was with his family.").

family has had to endure, and the knowledge that he is to blame for their heartache pains him the most.  However, despite his lengthy incarceration, their familial bond remains strong.

For Luis's younger sister, Carolina, Luis was "like a father to [her]."  *See* Letter of Carolina Martinelli.  Carolina describes her older brother as someone who is "loving and caring in every way," as someone who "always puts everyone's needs ahead of his own," and as someone who has had a strong, positive impact on her life:

> When I was 8 years old I was assigned in school to do a speech on who I admired. I did the speech on my brothers. They inspired me growing up. They were always there for me and supported me in every aspect of my life. Luis always went to all my soccer practices. My parents couldn't go but he never missed one practice. He always gave me pointers on how to play better. Both of them never missed my ballet presentations.

Letter of Carolina Martinelli.

It is obvious that family has been of the utmost importance to Luis ever since a young age, and it remains so to this day.  Luis has always been steadfastly devoted to his family, and several letters received from family members fondly recall memories that demonstrate Luis's kind heart and dedication to doing what is right.  *See, e.g.*, Letter of Marta L. de Martinelli (remembering that when he was a child, Luis used to often bring his mother flowers and how, as an adult, Luis would surprise her with chocolates and DVDs of her favorite television series); Letter of Maribel Adames de Garuz, Luis's mother-in-law ("In the year 2015, my husband and I went through difficult situations, health problems among others, and Luis Enrique was a strong support to us."); Letter of Ivonne Matute de Martinelli, Luis's aunt (explaining that "[a]s a father, he has infinite love for his family," and as a grandson "he never stopped attending the family gatherings that his grandparents held on Sundays and was always attentive to them"); Letter of Francisco J. Linares B., Luis's uncle (discussing the "very close relationship" that the two had during Luis's childhood and how Luis would participate in religious gatherings that his uncle led).

In 2012, Luis married his wife, Marelisa Garuz.  Together, Luis and Marelisa have two young daughters, ███████ (age seven) and ███████ (age four).  Making family the centerpiece of his life was further cemented when Luis became a father.  The effect was instantaneous.  Upon the birth of his first daughter, ███████, Luis's uncle recalls how he "could instantly see that Luis is a very good father."  *See* Letter of Francisco J. Linares B.  Luis's mother-in-law describes him as "the dedicated head of his family and the loving father of two girls" and as someone who "has demonstrated full commitment and devotion to his spouse and kids."  Letter of Maribel Adames de Garuz.  She firmly believes that he sees becoming a father to be "his highest achievement." *Id.* Luis's mother similarly views Luis as "a loving and caring father always vigilant of his family needs."  Letter of Marta L. de Martinelli.  But no letter captures Luis's complete devotion to his children better than the one submitted by his wife, Marelisa:

> Luis always has thought that family is the most important and valuable thing we have in this life; it is family who will offer unconditional love and support, and it is family that makes those moments that fill the soul and remind us who we are and were we come from. Since we met, Luis has always dedicated lot's of time to his family, because he believes that even if a family is not perfect, they should remain united. He is a caring and dedicated father, a wonderful husband and a good son.

Letter of Marelisa Garuz.

Obviously, Luis's nearly 23 months of incarceration have been an incredibly difficult time for Luis's wife and young daughters, who have seen a previously blissful family life thrust into turmoil:

> It is really saddening to think about our future now, having started this marriage with so much hope for our family and for us as a couple.  Definitely today, I don't know what awaits us; I feel our future is paralyzed, it is sad, empty and without direction.

*Id.*

Marelisa, ███████████'s pain is magnified by both the distance and duration of the family's separation from Luis, and the unfortunate impact that Luis's long detention has had on his nuclear family is evident to those close to them:

> The detention has changed the lives of Luis Enrique, my daughter and the children completely. They are devastated by the separation, as they are kept apart not only by the bars, but also by a huge distance, as Luis Enrique is arrested in a faraway country where the family cannot visit him. Luis Enrique is emotionally affected and deeply regrets his actions. He has expressed to me his remorse as well as his worries for the well being of his family.

Letter of Maribel Adames de Garuz.

And sadly, perhaps no one has suffered from Luis's nearly 23-month incarceration as much as his two young daughters, a pain that strikes particularly deep for Luis and is seen firsthand on a daily basis by Marelisa:

> This whole situation has been devastating for him, for myself, for our daughters – who although are very young and don't understand everything that is going on, suffer each day the absence of their father; they mis his care, his dedication and his guidance. ████████████████████████████████████████
> ███████████ There is no greater pain than watching your children suffer for your own fault and to feel the impotence of wanting to console them and be present without the ability to do so.

Letter of Marelisa Garuz.

Letters from other members of Luis's family strike a similar tone to that of Marelisa's letter, expressing how desperately the two young girls need their loving father. Luis's mother-in-law explains how her granddaughters "sincerely need the presence of their father but mostly his love and the interaction with them" and that she ████████████████████████
███████████████████████████████. Letter of Maribel Adames de Garuz; *see also* Letter of Marta L. de Martinelli ("They are a very close family and his children are devastated,

they miss their Dad so much."); Letter of Francisco J. Linares B. ("His daughters desperately need him in their lives.").

Luis's absence has been ███████████████████████████████████████

████████:

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

Letter of Marelisa Garuz.

████████████████████████████████████████████████████

████████████████████████████████ her father's detention and absence.  In summary, the young family has simply been devastated by Luis's incarceration.  And this suffering, that of his family, is what has taken the greatest emotional toll on Luis and serves as the strongest motivating factor for him to turn his life around.

**IV.    ADDITIONAL GOOD DEEDS PERFORMED BY LUIS**

Beyond those already discussed above, the letters received in support of Luis are replete with memories of good deeds, charitable works, and selfless acts that demonstrate how Luis is viewed by those who know him best.[7]  He is someone "with a big heart who is always looking to help people no matter what, without expecting anything in return."  Letter of Marelisa Garuz; *see* Letter of Rev. Fr. Juan Carlos Paguaga (describing Luis as someone who "truly sees the world and those in it at their best and always strives to make things better such that both systems and individuals alike live up to their potential").

---

[7] *See* supra Section II discussing in detail fond memories that Luis's former colleagues hold regarding his friendly disposition and generous nature.

### A.      Acts of Kindness

Being kind to others and treating everyone with respect are core facets of who Luis is as a human being.  Luis's childhood friend, Carlos, recalls a time when he transferred to Luis's high school as a junior:  he "arrived scared and nervous, not knowing many people there" and, from the beginning, he "was bullied and picked on immediately."  Letter of Carlos Jelenszky.  Carlos views this time still as "one of the toughest periods of [his] life."  *Id.*  However, Carlos "will never forget how Quique reached out to [him] in those days and included [him] in his group of friends."  *Id.* He acknowledges that Luis "didn't need to, and he certainly risked getting bullied himself, but he didn't care and extended a hand of grace to a person in need."  *Id.*

Carlos also remembers how Luis stepped forward when Carlos's family was stricken by tragedy and helped him get through a difficult time:

> At about the time we were graduating from college, my father was diagnosed with pancreatic cancer and he died less than a year later.  It was a difficult time for me, as I was very close to my father.  I received a lot of support from my friends, but Quique went the extra mile and planned a fishing trip for a group of us to take my mind off the loss. He planned everything and took care of the preparations.  Might seem like a simple gesture but not everybody takes the time and effort to do these things for others.  I won't ever forget it.

*Id.*

It was, and remains, important to Luis to make others feel appreciated.  When his children's nanny was getting married, Luis "wanted to make sure he expressed his gratitude for the care and love the nanny gave to his two girls, so he prepared the dinner, the cake and even the ceremony." Letter of Ursula Barrantes-Tarafa.  Luis wanted to ensure that she was treated "like family."  *Id.*

And whether it is something big or small, Luis is simply the type of person who is always willing, and happy, to lend a helping hand.  When his sister, Carolina, moved from her dormitory to an apartment near campus during her second year of college, Luis was there not only to help

Carolina move and set up her new apartment, but to assist all of her friends as well.  *See* Letter of Carolina Martinelli ("I remember Luis not only helped me set up my new apartment, but he also helped my friends set up theirs.").  Luis is someone who is "[c]onstantly making sure the people around him are okay and looks for ways in which he can make everyone's life better."  *Id.*; *see, e.g.*, Letter of Marta L. de Martinelli ("Every Christmas he wanted to buy presents for the cleaning personnel at his high school.  They were always on his mind.").

> **B.      Luis's Extensive Charity Work**

There is no question that Luis comes from a place of privilege.  Nevertheless, Luis has done the best he could to use his position to help others, donating both his resources and his time to the less fortunate.  *See, e.g.*, Letter of Mayin Correa D., Panamanian politician and journalist ("For many years, they were donors to those in most need . . . .").

Father Ovidio Madrigal, a Catholic priest in the underserved community of Montero Oscuro, Panama, recalls with fondness Luis's "willing heart" and how he "was very generous and always supported our community with food bags and toys for the children."  Letter of Father Ovidio Madrigal ("Every year . . . we knew we could count on him and his supportive and generous spirit.").

When his mother would "organize medical tours with . . . doctors and dentists in order to visit poor communities," Luis would join the group on the medical tours "[w]henever possible" and was "always very eager to help."  Letter of Marta L. de Martinelli; *see* Letter of Marelisa Garuz ("When we began to date, I remember on the weekends Luis would ask me to go with him to remote rural areas of Panama where there are medical and health scarcities.").  Even though he is not a doctor, Luis "was always willing to do what he could to help" on the medical tours, donating his time to assist with "organizing and distributing medications and resources to help the

local doctors and their communities." Letter of Marelisa Garuz. Similarly, Luis's aunt recalls with fondness how Luis would "play with the kids," help "raise funds" and dedicate his time "on special occasions like Christmas" for Fundación Ofrece un Hogar, an organization that is part of the Catholic Church and dedicated to helping and sheltering homeless children. Letter of Ivonne Matute de Martinelli.

Throughout his life, Luis has prioritized sharing his blessings, and his time, with those in need. These things were done not because of a desire for recognition, for headlines, or for personal gain of any sort; they were simply done because Luis viewed them as the right thing to do. There is a Spanish phrase that Luis "always says . . . 'Haz el bien sin importar a quien,' which basically means to always do good onto others." Letter of Marelisa Garuz. The above demonstrates that Luis practices what he preaches.

## V.   OFFENSE CONDUCT

Luis has wholeheartedly accepted responsibility for his criminal conduct. In addition to entering into a plea agreement with the government in which he admitted to the offense conduct, Luis provided the Court with an extremely detailed allocution during his plea hearing in which he identified the accounts and entities involved in his crime.

## VI.   THE RELEVANT SENTENCING CONSIDERATIONS MERIT A SENTENCE OF TIME-SERVED

For the reasons set forth below, coupled with the facts and personal history outlined above, we respectfully urge the Court to sentence Luis to time-served.

### A.   The Sentencing Guidelines Calculation Should Not Be Presumed Reasonable

Luis's plea agreement contains an agreed-upon Guidelines range of 108-135 months, and the Presentence Investigation Report ("PSR") contains a restricted Guidelines range of 210 to 240 months. *See* Plea Agreement ¶ 2; PSR ¶ 68. However, as the Court no doubt knows, that

Guidelines range is merely advisory. *United States v. Booker*, 543 U.S. 220, 245 (2005) (establishing that the Guidelines are advisory); *see United States v. Thomas*, 255 F. Supp. 3d 400, 403 (E.D.N.Y. 2017) ("[T]he Guidelines are advisory; a sentencing court may depart from them in the interest of justice as well as in light of other statutory concerns as expressed in section 3553(a)."). And the Supreme Court has not only made clear that the Guidelines are solely advisory, but also that the Guidelines are just "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *see also Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) ("[G]iving 'heavy' weight to the Guidelines may therefore be in tension, if not conflict, with § 3553(a)'s command to consider a multitude of factors.").

What is more, the sentencing process does not permit any presumption by a district court that the applicable Guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . . . The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.") (emphasis omitted); *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) ("A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors . . . ."). The reasonableness of a sentence is not determined by how much "a sentence deviates from the applicable Guidelines range," but rather is "determined instead by the district court's individualized application of the statutory sentencing factors." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).

**B.     Reasons For Departure From the Guidelines and For a Sentence of Time-Served**

The Court is no doubt also aware, and as such it does not bear belaboring, that the Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a).   18 U.S.C. § 3553(a) (emphasis added).  Following its introductory instruction, Section 3553(a) lists several factors that are to be considered by the Court in determining an appropriate sentence in line with the purposes listed in its second paragraph.  As a matter of law, the Court "may not presume that the Guidelines range is reasonable," but rather must make an individual assessment of the Section 3553(a) factors based on the facts presented.  *Gall v. United States*, 552 U.S. 38, 50 (2007).  As part of this analysis, the Court must consider every "person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Id.* at 52 (quoting *Koon v. United States*, 518 U.S. 81 (1996)).  Again, we respectfully submit that a sentence of time-served, which would equate to the nearly 23 months that Luis already served, will sufficiently satisfy the goals of § 3553(a).  Of particular relevance in this case, and supportive of this request for a sentence of time-served, are the following factors and facts:

**1.     Luis's Life and Character Counsel in Favor of Time-Served**

A critical statutory factor instructs sentencing courts to consider "the history and characteristics of the defendant" when deciding upon a just sentence.  18 U.S.C. § 3553(a)(1).  In its analysis of this factor and the individual to be sentenced, it is incumbent on the Court to recognize that:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what

Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

A complete evaluation of the "history and characteristics" of Luis counsel in favor of a downward departure from the Guidelines and a sentence of time-served.[8] Overall, Luis has led a life that should not be defined solely by the conduct for which he is currently before the Court, but by the kind-hearted and generous nature he has exhibited toward family, friends, colleagues and complete strangers, as well as the considerable charitable work that he has done throughout his life by the donation of his time and resources to both secular charities and those affiliated with his church. *See United States v. Sarlo*, 269 F. App'x 30, 31 (2d Cir. 2008) (citing the defendant's "charitable acts and involvement with her church" as factors in the court's decision to impose a below-Guidelines sentence); *United States v. DiMattina*, 885 F. Supp. 2d 572, 581-82 (E.D.N.Y. 2012) (explaining that the "history and characteristics of the defendant" warranted a downward departure from the Guidelines, a conclusion that was supported by "numerous letters attesting to his good character and many acts of charity").

Notably, none of the acts of generosity or charitable work in which Luis participated were done to "enhance his image" or "gain status," which makes them all the more notable for sentencing purposes. *See Adelson*, 441 F. Supp. 2d at 513 ("[The defendant's] good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing."). Luis never imagined that any of the aforementioned good deeds would be of any personal use to him, and certainly not in the current context. Rather, this is just how Luis lived his life.

---

[8] The "history and characteristics" of Luis, which are filled with acts of kindness, generosity, and charity, are described in detail in Sections II-IV.

In essence, the people who know Luis best paint an accurate portrait of Luis's character. His quiet acts of kindness and history of volunteerism have been discussed at length in the preceding sections of this submission and in the many letters written on Luis's behalf by his family, friends, colleagues and others who have attested to the type of person he truly is.

**2. The Unique Nature and Circumstances of the Offense Counsel in Favor of Time-Served**

The factors also instruct the Court to consider "the nature and circumstances of the offense" when deciding on an appropriate sentence. 18 U.S.C. § 3553(a)(1). To be clear, Luis holds himself fully responsible for his criminal conduct. He understands the serious nature of his actions, and he knows that he alone is responsible for the poor choices that he made. Luis always had the ability to say no. Still, and as alluded to above, his acts were committed in the context of a firmly entrenched, demanding, and overall difficult family dynamic, one in which Luis, and others, would only ask "how high" when told to jump. Luis now sees where that got him: incarcerated, isolated from his family and humiliated. Again, while this in no way excuses his criminal conduct, it provides some necessary color when pondering the question of what led Luis to stray from what had been an otherwise moral and productive life. The Court can be assured that Luis will not cow to the pressures exerted upon him by others or repeat the type of poor decision-making that put him in his current situation.

As explained in greater detail in Section VI(B)(6)(b), during the initial stages of Luis's participation in the charged scheme, he believed what he had been told by someone whom he trusted and whose orders he had followed his entire life: that the transactions that he participated in were in furtherance of lawful business that the Panama Government Official had with Odebrecht. Importantly, this was not a scheme that Luis helped devise, nor was his initial involvement in the crime premeditated or willful, as he did not even understand that what he was

doing was illegal.  Luis's criminal liability in this case stems from the moment that he came to understand that his actions were criminal and his participation in the scheme thereafter. Nevertheless, Luis's initial involvement in the scheme was based on false information and misguided trust.  Certainly, this does not absolve Luis of his role in the crime, but it does provide both critical context for how he found himself in the midst of a criminal conspiracy, and why the Court should be confident that Luis will never be in such a predicament again.

### 3. Luis Has Already Spent Considerable Time, Nearly 23 Months, in Prison for this Offense

Luis was detained for over 16 months in a Guatemalan prison, prior to his voluntary extradition to the United States, for the same conduct that he is now before the Court.  As the Court is aware, upon his arrival in the United States, Luis was ordered detained by Magistrate Judge Marcia M. Henry on November 16, 2021.  That order was appealed, and the Court affirmed that permanent order of detention for Luis on November 23, 2021.  *See* Order of Detention Pending Trial, ECF No. 29.  As a result, Luis has been detained at the MDC since his arrival in the United States from Guatemala late last year.

### a. Luis must be given credit for the time he spent in official detention in Guatemala

By statute, the 16 months Luis served in the Guatemalan prison must be credited against any sentence he receives in this case, as his detention in Guatemala was for the very same conduct that is the subject of this sentencing.[9]  "A defendant shall be given credit toward the service of a

---

[9] *Zavala v. Ives*, 785 F.3d 367, 377 (9th Cir. 2015) ("BOP already grants sentencing credit for time spent in state **or foreign** custody where that time was not credited to another sentence.") (emphasis added) (*citing* 18 U.S.C.A. § 3585 (b)).  Further, Program Statement 5880.28 of the BOP Sentence Computation Manual, which implements the BOP's policies with respect to the provisions of Section 3585(b), authorizes credit for "[t]ime spent in non-federal presentence custody from the date of the federal offense, that does not overlap any other authorized prior custody time credits" and which is related to the offense for which the inmate was convicted.  Fed. Bureau of Prisons, U.S. Dep't of Just., *Program Statement 5880.28*, at p. 1-14A (1999); *see* 2017 National Seminar on the Federal Sentencing Guidelines, *Federal Sentence Computation & Interaction of Federal and Non-Federal Sentences* 2-3, available at https://www.ussc.gov/sites/default/files/pdf/training/annual-national-trainingseminar/2017/BOP_FSS.pdf

term of imprisonment for any time he has spent in official detention prior to the date the sentence commences – (1) as a result of the offense for which the sentence was imposed . . . that has not been credited against another sentence." 18 U.S.C.A. § 3585(b).  Such is the case here.  The more than 16 months that Luis spent in detention in Guatemala has not been credited against another sentence, and his Guatemalan detention was based on the charging instruments filed in this case. *See* Letter in Support of the Government's Request for a Permanent Order of Detention as to Luis Enrique Martinelli Linares, ECF No. 22 (stating that Luis was arrested "on July 6, 2020 in Guatemala, pursuant to a provisional arrest request that the United States submitted to Guatemala for this same conduct" for which he is now before this Court).  Together with the more than six months that he will have spent in detention at the MDC at the time of sentencing, under the most regrettable of circumstances, Luis will have served nearly 23 months in prison for this offense by the time he is sentenced by the Court on May 20, 2022.

The Court is indeed familiar with the statutory requirement of crediting defendants for terms of imprisonment served outside the United States.  In sentencing Jose M. Guzman in the case of *United States v. Guzman*, the Court ordered that Guzman "receive credit for time served (22 months) in the Dominican Republic." Criminal Cause for Sentence, *United States v. Guzman*, No. 1 Cr. 1157 (RJD) (E.D.N.Y. May 16, 2007), ECF No. 166.  In that case, Guzman, in the midst of cooperating with the government, had "fled to the Dominican Republic to evade the instant charges."  Gov't Sent'g Memorandum at 3, *Guzman*, No. 1 Cr. 1157 (RJD), ECF No. 163. Subsequent to his flight to the Dominican Republic, Guzman was arrested on a provisional arrest warrant and held in detention in the Dominican Republic until his extradition to the United States

---

(explaining that the "[l]ocation of presentence detention (federal, state, or foreign) is not relevant in deciding whether prior custody credit will be awarded" pursuant to § 3585(b)).

nearly two years later, time for which he received credit from the Court at sentencing.  *See* Criminal Cause for Sentence, *Guzman*, No. 1 Cr. 1157 (RJD), ECF No. 166.  Similar to Guzman, we respectfully request that the Court fully credit Luis for the time that he was imprisoned in Guatemala in formulating the current sentence.

> **b.   The conditions of Luis's detention at the MDC have been inhumane**

As noted, following his voluntary extradition to the United States, Luis was immediately permanently detained at the MDC as he awaited sentencing in this matter.  The conditions of Luis's detention at the MDC for the last six months have been, frankly, inhumane.  His detention began with an 18-day stint in administrative segregation, which is essentially solitary confinement, for quarantine purposes because of the COVID-19 pandemic.  Following this, Luis had approximately three weeks of relatively normal conditions in general population at the MDC.  Nevertheless, after those three weeks, Luis (and all other inmates at the MDC) was subjected to a 52-day lockdown that was prompted by, at first, concerns related to the spread of the Omicron variant of COVID-19, and then safety and security concerns stemming from events that occurred at another  federal detention facility.  For the first portion of the nearly two-month lockdown, instituted for  COVID-19 reasons, Luis was locked in his cell for 24 hours a day, four days a week; the other three days he was permitted to be out of his cell for 30 minutes to shower, and perhaps call a family member.  To be clear, that lockdown permitted Luis to leave his cell for a total of 90 minutes per week.

But it got worse.  On January 31, 2022, a gang altercation occurred at USP Beaumont, in Texas, that tragically resulted in the death of two inmates and injuries to several others.[10]  In

---

[10] Walter Pavlo, *Federal Bureau Of Prisons On National Lockdown After Deadly Fights at USP Beaumont*, FORBES, Feb. 2, 2022, https://www.forbes.com/sites/walterpavlo/2022/02/02/federal-bureau-of-prisons-on-national-lockdown-after-deadly-fights-at-usp-beaumont/?sh=4a42b3825af2.

response, the Bureau of Prisons instituted an unprecedented lockdown of all 122 of its facilities across the United States, including the MDC.[11]  As a result, the MDC's lockdown policies became even more restrictive than the COVID protocols.  Luis was locked in his cell for all but 10 minutes a day, three days a week, equating to a mere 30 minutes of total time *per week* that Luis could leave his cell to bathe.  During this portion of the 52-day lockdown, inmates were prohibited from using the telephones, email, or computers for non-legal communications, making the lockdown conditions even more isolating and debilitating.

Throughout the 52-day lockdown, besides the minimal amount of time Luis was permitted outside his cell, he remained locked in 24/7.  The lockdown was finally lifted on February 17, 2022.  In summary, Luis spent around 75% of his first three months at the MDC in essentially solitary confinement.

Since then, life at the MDC has returned to what would be described as generally "normal" in a maximum security facility.  But as the Court knows,[12] conditions at the MDC, even during normal times, are quite unfortunate.[13]  Nonetheless, Luis has done his best, with the little opportunity afforded him, to contribute positively to the lives of other inmates while incarcerated at MDC.  Since the various lockdowns were lifted, consistent with Luis's dedication to his religion

---

[11] *Id.*

[12] *See* Bail Application Hr'g Tr. at 28:7-9, Nov. 23, 2021 ("As unfortunate as it is, the decision of putting somebody in MDC for whatever length of time under the current conditions . . . .").

[13] Transcript of Hearing at 20:8-9; 19:18, *United States v. Days*, No. 19-CR-0619 (CM), (S.D.N.Y. May 12, 2021), ECF No. 35 (the Honorable Colleen McMahon stating that "there is no excuse for the conditions in [MDC and MCC]" and describing the conditions in the facility as "disgusting" and "inhuman"); Letter from The Sentencing Project to the Hon. Merrick Garland, Attorney General (Feb. 14, 2022), https://www.sentencingproject.org/wp-content/uploads/2022/02/BOP-Letter-2-14.pdf (explaining that "[p]ervasive mismanagement has exacerbated inhumane conditions" at the MDC and referencing a past description of the facility as "an ongoing disgrace" because of "its repeated losses of electricity, water, and hot food" made by the Honorable William Kuntz); Shauna Fitzgerald & Christian Prince, *Brooklyn Federal Prison Denying Communication Rights in Pandemic*, FILTER MAGAZINE (Jan. 25, 2021), https://filtermag.org/brooklyn-federal-prison-covid-communication/ (referencing the "long history of neglect and abuse" at MDC "which has only intensified during the pandemic" before detailing instances of rights violations at the facility).

and his desire to help others, Luis has become an active participant in a bible study group in his unit at the facility.  *See* Letter of Rev. Ngozi Osuji, Chaplain at the Metropolitan Detention Center (describing Luis's strict dedication to religious activities at the facility such as "bible studies, Rosary prayer individually or in groups, reflections, and testimonies").  When the bible study group began, it was solely comprised of four individuals.  As of the last count, it had nearly 20 members, the largest such group in the entire facility.  The members meet three or four times per week, for about an hour each time.  The majority of the bible study group members speak Spanish, and a few speak English.  Using his language skills, Luis serves as a translator to ensure that all members of the group can follow and participate in the readings and discussions, and he is also one of the main bible passage readers of the group.  Luis has also helped shape the meetings, providing input to the group's leader as to how to improve the gatherings, such as suggesting the addition of a prayer at the end of each meeting and helping to formulate the discussion topics and group organization, steps that have led to increased inmate attendance at the bible study sessions. *Id.* (explaining that Luis has "helped increase the attendance of Catholic and Christian inmates at the unit chapel").  In recognition of this, Luis was one of only around two dozen individuals at the facility who were chosen to meet Bishop Robert J. Brennan, the Bishop of Brooklyn, when he visited the facility in late March, a meeting that Luis considered to be a great honor.  *Id.*  ("This was why I chose him as one of the Altar Servers at the Mass of Most Rev. Robert J. Brennan, the Catholic Bishop of Brooklyn . . . a rare opportunity for an inmate in any B.O.P. facility.").  The fact that Luis "has the best pastoral interest of the inmate population at heart" is what "made him win that spot." *Id.*

### 4.       A Further Period of Incarceration is Not Necessary for Deterrence Purposes or to Protect the Public

Needless to say, Luis's detention, both in Guatemala and the MDC, has left an indelible impression on him.  A sentence of time-served would "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant" thereby serving both specific and general deterrence goals.  18 U.S.C. § 3553(a)(2).  As mentioned previously, a sentence of time-served equates to nearly 23 months' imprisonment for the offense conduct. Certainly, no further term of incarceration is necessary to serve the purpose of general deterrence, nor is it necessary to deter Luis from committing any future crime.  And further, what is, in effect, an almost 23-month sentence "reflect[s] the seriousness of the offense . . . promote[s] respect for the law . . . and provide[s] just punishment" as well.  *Id.*

### a.       Luis will not engage in future misconduct and specific deterrence will be achieved by a sentence of time-served

Specific deterrence is achieved by sending a message to a defendant that his criminal actions have consequences.  That is a message that Luis has undoubtedly received loud and clear. He has endured the consequences of his actions and has already been severely punished for his conduct.  And that punishment has taken many forms.  First, he has been incarcerated for nearly 23 months as punishment for his unlawful conduct.  *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (stating "let me be clear: any amount of prison time is a serious amount of prison time").  Luis's nearly two years in detention is a far cry from the life he once knew, and this case represents his first brush with the law.  This alone would be sufficient to satisfy specific deterrence concerns and ensure that Luis does not engage in future criminal conduct.

There are additional consequences that Luis has suffered as a result of his conduct that further ensure he will forever remain on the straight and narrow.  One of those serves as an even more powerful deterrent effect and further underscores that no additional specific deterrence is necessary, and that is the terrible impact his detention and absence have had on his family.  *United States v. Gayle*, No. 09-CR-358, 2010 WL 2540488, at *2 (E.D.N.Y. June 17, 2010) (explaining that specific deterrence was achieved due to, among other reasons, the defendant's "strong family ties" and imposing a sentence of five years' probation for conspiracy to commit wire fraud); *United States v. Genis-Maldonado*, No. 10-CR-142, 2010 WL 3125663, at *2 (E.D.N.Y. Aug. 4, 2010) (finding it to be "unlikely that [the defendant] will engage in further criminal activity in light of his desire not to be separated from his children").

The importance of Luis's family to him and the severe emotional and psychological trauma and pain that this case has caused his wife, two young daughters and entire family cannot be overstated.  Luis knows that the hurt and harm that he has caused his loved ones is irreparable, but what is worse is the time that Luis has missed with his young family.  Luis's daughters are four and seven years old, very formative times in their growth and development.  Because of his actions, Luis has missed countless moments, memories, and milestones in his daughters' lives.  He has spent years not being able to be a father to his young girls.  Luis also missed his grandmother's 103rd birthday celebration earlier this year, and may well miss the birth of his first nephew in the upcoming weeks.  These are things that Luis cannot get back, and the very thought of missing any more time with his family is the most powerful deterrent that will forever ensure Luis never engages in any criminal conduct again.

Another strong deterrent effect is the very public nature and humiliation resulting from his conduct, and the permanent black mark that will forever be attached to Luis's name and reputation

as a result.  Because of his family's profile in Panama, Luis's arrest, extradition, case developments and court hearings have all received outsized publicity, and Luis has been much-maligned in the press.  As is evidenced by the letters submitted on his behalf, the very public nature of his case has ensured that people from all facets of Luis's life – family, friends, work colleagues and even religious leaders – are all aware of this case and Luis's crime.  The embarrassment and shame associated with such widespread public knowledge of his misdeeds serves as an additional deterrent for Luis.  *See Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, [the defendant] is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result.").

Finally, given the "unique" circumstances that led to Luis's conduct – his initial unawareness of the illegal nature of the transactions and the overbearing and extremely complicated family dynamic – this Court can rest assured that Luis's conduct was an aberration from a generally law-abiding life and will never be repeated again.  *See supra* Section I; *see also infra* Section VI(B)(6)(b).  In summary, this Court can have the utmost confidence that Luis will not commit future crimes.  Luis has demonstrated sincere remorse, suffered immensely for his actions, and is determined to once again become a positive member of society and, more importantly, the father his daughters need him to be.

### b.    A sentence of time-served will achieve strong general deterrence goals

In addition to satisfying the specific deterrence goals of § 3553(a), a sentence of time-served here will also provide general deterrence because it sends a strong, clear message to

potential offenders that similar criminal conduct will result in incarceration. *See United States v. Goltson*, No. 09-CR461, 2010 WL 4023299, at *2 (E.D.N.Y. Oct. 13, 2010) (finding that a sentence of time-served "will send a clear message that any involvement in drug trafficking will result in [a] substantial sentence"). A sentence of time-served for Luis would equate to nearly 23 months in detention. That is no doubt a substantial sentence, and Luis's case has been, and will continue to be, very widely publicized simply because he is the son of a former President of Panama. If Luis receives a sentence of time-served, or close to 23 months, an incredibly powerful message will be sent that no one is above the law and that, if someone commits a crime, regardless of political connections, they will be prosecuted and held accountable. A sentence of time-served is more than sufficient to accomplish general deterrence goals because it makes it clear that involvement in such conduct will result in a sentence of substantial confinement demonstrated by the substantial amount of time that Luis has already served in prison.

Further, an additional period of incarceration is not necessary to serve as a general deterrent to others because it is the certainty of detention, rather than its length, that has been shown to have a greater deterrent effect on potential white-collar offenders. In fact, "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders" and achieve the desired general deterrence goals of § 3553(a). *Adelson*, 441 F. Supp. 2d at 514 (*citing* Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) and Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447 (2007) (explaining that for white-collar crimes "certainty of punishment is empirically known to be a far better deterrent than

its severity"). As such, adequate deterrence has already been achieved and a non-Guidelines sentence of time-served is warranted.

> **5.** **The Sentence Calculated Pursuant to the Guidelines is Unjustly Inflated and, as Such, is Inconsistent with the Statutory Goals of Sentencing Provided in 18 U.S.C. § 3553(a)**

Although the Court is required, pursuant to § 3553(a)(4), to consider the advisory sentencing range calculated pursuant to the Sentencing Guidelines, the Court is under no obligation to defer towards, give significant weight to, or even presume that those calculations are reasonable. *See supra* Section VI(A). We respectfully submit that the Court should not do so here. The Court needs no special justification to vary downward from the advisory guideline range. *Spears v. United States*, 555 U.S. 261, 264 (2009) ("The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines . . . .") (internal citations and quotations omitted); *United States v. Cavera*, 550 F.3d 180, 210 (2d Cir. 2008) (Straub, J., concurring) (stating that "the Supreme Court explained that sentencing 'courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines'") (quoting *Kimbrough v. United States*, 552 U.S. 85, 102 (2007)).

Here, even setting aside the reasons discussed in the other sections of this sentencing memorandum, the Court has ample grounds to vary downward from the Guidelines. First and foremost, the Guidelines range calculated by the Probation Department in the PSR is incorrect. *See* PSR ¶ 68. The PSR contemplates a total offense level of 37 and a Guidelines imprisonment range of 210 to 262 months, with a restricted Guidelines range of 210 to 240 months. *See* PSR ¶¶ 34, 68. The reasons why the total offense level and corresponding Guidelines range calculated by the Probation Department are incorrect have been explained in detail in the Objections to the Draft Presentence Investigation Report and Sentence Recommendation sent to the Probation Department

by counsel, and then filed under seal on the docket for the Court's consideration on April 12, 2022. Accordingly, we respectfully submit that, for the reasons outlined in our objections to the PSR and in this memorandum, the Guidelines range contemplated by the Probation Department be summarily disregarded by the Court in formulating Luis's sentence.  It is, of course, worth noting that both the government and the defense agree that a proper Guidelines calculation yields an advisory range of  108 to 135 months based on a total offense level of 31, as was stipulated in the plea agreement.  Plea Agreement ¶ 2.

Nevertheless, even the technically correct Guidelines range is grossly inflated and should not be relied upon by the Court.  The excessive, and unjust, impact that the associated monetary amount has on the Guidelines calculations for white-collar crimes has been widely criticized within this Circuit.  *See, e.g.*, *Johnson*, 2018 WL 1997975, at *3 ("As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *Gupta*, 904 F. Supp. 2d at 351 ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (discussing monetary crimes, specifically theft and fraud, and lamenting the "questionable" guidelines scheme because in many cases "the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

The aforementioned criticisms have resulted in courts within this Circuit frequently disregarding Guidelines ranges in white-collar cases where that range is unduly inflated by the

monetary amount related to the conduct.  Here, the total offense level is disproportionately driven by the value of the funds, which account for 22 points out of the total offense level of 31, over two-thirds of the total.  And "where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *Adelson*, 441 F. Supp. 2d at 515; *see also United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) ("Although the District Court used the intended loss amount correctly for purposes of calculating the Sentencing Guidelines range, the Court erred by failing to dramatically discount that calculation when weighing the section 3553(a) factors against the totality of the circumstances of this case."); *Johnson*, 2018 WL 1997975, at *4 ("Where application of the loss enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more heavily on the § 3553 factors.").

Luis's case is emblematic of the issues raised above, as the value of the funds launched his recommended period of incarceration from 6 to 12 months (which is less time than Luis has already served), to 108 to 135 months.  Because of this, we respectfully submit that the Guidelines range grossly overstates the nature and circumstances of the relevant offense, and it fails to take into consideration the § 3553(a) factors that heavily weigh in favor of a substantial downward departure.  Therefore, in order to ensure that Luis's sentence is "not greater than necessary," we respectfully urge the Court to disregard the advisory Guidelines range and sentence Luis to time-served.  *See* 18 U.S.C. § 3553(a).

6.       **The Imposition of Any Sentence Other Than One for Time-Served Would Create Unwarranted Disparities in Sentencing**

We respectfully submit that any sentence greater than time-served in this case would run contrary to Congress's mandate that sentencing courts should strive to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  By his sentencing date, Luis will have served nearly 23 months in prison.  That is over two months longer than the sentence the Court imposed on Jose Carlos Grubisich, just six months ago, for more egregious conduct related to the exact same scheme.

a.       **Luis will be sentenced for conduct related to the same Odebrecht bribery scheme for which this Court sentenced Grubisich**

On October 12, 2021, this Court sentenced Grubisich, the former CEO of the Odebrecht subsidiary Braskem, to 20 months' imprisonment for conspiracy to commit bribery and conspiracy to commit books and records violations.[14]  *See* Judgment at 2, *United States v. Grubisich*, 19 Cr. 102 (RJD) (E.D.N.Y. Oct. 25, 2021), ECF No. 102; Gov't Sent'g Memorandum at 2, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 97 (stating that Grubisich "was the CEO of Braskem . . . which was a subsidiary of Brazilian holding company Odebrecht").  At that sentencing hearing, Acting Co-Principal Deputy Chief of the DOJ's Fraud Section Lorinda Laryea explained, in response to a question from the Court, that of the approximately 71 individuals from Odebrecht and Braskem who were involved in the overarching investigation in Brazil, the "majority . . . end[ed] up getting home confinement" and the individual who served the most time, Marcelo Odebrecht, one of the

---

[14] We note that at the sentencing hearing of Grubisich, the Court adopted a Guidelines level of 38 and an advisory sentencing range of 235 to 293 months for Grubisich's conduct.  *See* Sent'g Hearing Transcript at 5:16-17, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 100.  Grubisich's advisory sentencing range was significantly higher than that stipulated to by the defense and government in Luis's plea agreement (108 to 135 months), and is also higher than the Guidelines range of 210 to 262 months (with a restricted Guidelines range of 210 to 240 months) incorrectly calculated by the Probation Department with respect to Luis.  *See* Plea Agreement ¶ 2; PSR ¶¶ 34, 68.

33

owners of the Odebrecht companies, received an approximately two-year sentence.  *See* Sent'g Hearing Transcript at 6:17-7:8, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 100.

Grubisich, after receiving credit for his four months of pretrial detention, *see* 18 U.S.C. § 3585(b), will serve sixteen months (less any good-time credit) for "knowingly and willfully participat[ing] in a conspiracy to divert *hundreds of millions of dollars* from Braskem into a secret illegal slush fund and to pay bribes to government officials, political parties, and others in Brazil to obtain and retain business."  Gov't Sent'g Memorandum at 1, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 97 (emphasis added).

The conduct for which Luis is set to be sentenced is part of the same overarching Odebrecht bribery scheme that Grubisich ran as CEO of the Odebrecht subsidiary Braskem, and for which Grubisich received a 20-month sentence.[15]  The fact that Luis's conduct and Grubisich's conduct is part of the same overarching scheme is clear, and a comparison of filings by the government in the two cases demonstrates that obvious point.  In its Amended Complaint in this case, the government included an entire section entitled, "Overview of the Defendants' Role in the Odebrecht Bribery Scheme."  *See* Am. Compl. at 7, ECF No. 5.  In the Amended Complaint, the government alleged that Luis and his brother Ricardo "participated in the Odebrecht bribery scheme by, among other things, serving as intermediaries for corrupt payments and the provision of other things of value that Odebrecht offered and provided to the Panama Government Official." *Id.* ¶ 27.  Similarly, in its Indictment of Grubisich, the government explained that Odebrecht, Braskem, as well as their employees and others, "engaged in a massive bribery scheme" for which "Odebrecht created and funded an elaborate, secret financial structure that operated to account for

---

[15] What is more, Grubisich's case included the same U.S. Attorney's Office, DOJ Fraud Section, and Court that are involved in Luis's case.

and disburse bribe payments to, and for the benefit of, foreign officials and foreign political parties." Indictment ¶¶ 17-18, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 1. The same aforementioned "bribery scheme" serves as the foundation for the charges against both Grubisich and Luis. Of course, the fact that Grubisich may not have specifically funded the bribery payments at issue here does nothing to undermine the conclusion that Grubisich essentially ran a program for Odebrecht/Braskem to bribe foreign officials to obtain or maintain business, and Luis and his brother have pleaded guilty to having agreed to help move some portion of Odebrecht's bribe money to Swiss bank accounts for the benefit of one such foreign official.

Further evidence that both cases are part of the same overarching scheme is that Luis's and Grubisich's actions concerned the disbursement and receipt of funds from the same Odebrecht department, Odebrecht's Division of Structured Operations, which was the nucleus of the Odebrecht bribery scheme. Odebrecht's Division of Structured Operations was described by the government as "a department within Odebrecht that was created and operated for the purpose of carrying out corrupt and other improper transactions in order to assist Odebrecht and Braskem in their efforts to obtain and retain business and economic benefits around the world." Gov't Sent'g Memorandum at 3, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 97. Included as Exhibit A to the executed plea agreement between Luis and the government is a Factual Proffer in Support of Guilty Plea that outlines the conduct to which Luis pleaded guilty and is to be sentenced. After describing the relevant conduct in which Luis participated, the Factual Proffer explains that the "above-described agreements and acts were in relation to a scheme to receive money from Odebrecht's Division of Structured Operations to promote the bribery of the Panama Government Official." Plea Agreement, Exhibit A ¶ 5. And, as the government explained in its sentencing memorandum in Grubisich's case, the "fraudulent payments" originating from Braskem were sent, via the

fraudulent mechanism created by Grubisich, "to bank accounts controlled by the Division of Structured Operations ('DSO')."  Gov't Sent'g Memorandum at 3, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 97.  "The DSO effectively functioned as a stand-alone bribe department within Odebrecht for the benefit of Odebrecht and its subsidiaries, including Braskem."  Indictment ¶ 18, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 1.  The funds received by the DSO from Braskem's bank accounts then "were subsequently disbursed by the DSO to make corrupt payments on Braskem's behalf." *Id.* ¶ 19.  The fact that both Luis's and Grubisich's conduct concerned funds from the same DSO, the slush fund at the center of the Odebrecht bribery scheme, makes it even more clear that Luis's conduct stems from the same overarching Odebrecht bribery scheme contemplated in Grubisich's case.

The connection between Luis's conduct and the Odebrecht bribery scheme has also been acknowledged by the Probation Department.  As the Sentence Recommendation explains, "[Luis] and his brother, co-defendant Ricardo Alberto Martinelli Linares, were involved in the Odebrecht Bribery Scheme, through which Odebrecht, a holding company conglomerate operating numerous entities, paid bribes to [the Panama Government Official]."

**b.      Grubisich's role and conduct in the Odebrecht bribery scheme was more egregious than that of Luis**

It is certainly worth recognizing that there are significant differences between Luis's and Grubisich's conduct.  One big difference is their respective roles in the Odebrecht bribery scheme. Grubisich was the CEO of Braskem, one of the companies that created and executed the bribery scheme.  As CEO of Braskem, Grubisich "instructed" and gave "authorization" for the very creation of the fraudulent system through which Braskem made illicit payments, and then "negotiated and authorized [the actual] bribe payments."  Gov't Sent'g Memorandum at 2-3, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 97; Indictment ¶ 26, *Grubisich*, 19 Cr. 102 (RJD), ECF No.

1.  As Deputy Chief Lorinda Laryea explained to the Court during Grubisich's sentencing hearing, Grubisich "helped put in place mechanisms to continue corrupt and fraudulent schemes at Braskem for almost a decade."  Sent'g Hearing Transcript at 19:17-19, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 100.  Luis, by comparison, without minimizing his involvement, "served as an intermediary who had no supervisory authority over other participants," and played no role in the formulation of the bribery agreement, but simply assisted in the facilitation of Odebrecht's illicit payments to the Panama Government Official.  PSR ¶ 13.

A second difference is the amount of money related to their respective crimes.  Luis, jointly with his brother, is said to be responsible for agreeing to launder $28,341,870.67 in funds related to the Odebrecht Scheme.  PSR ¶ 9.  Grubisich was responsible, no matter how you stack it, for a far greater amount of money.  In a September 17, 2021 letter to the Court, Grubisich's counsel explained that approximately $37 million in Braskem funds were diverted for bribery purposes while Grubisich was CEO of the company.  *See* Objection to Presentence Investigation Report by Jose Carlos Grubisich ¶ 5, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 98-1.  But after Grubisich stepped down as CEO, an additional $215 million were diverted for bribery purposes by Braskem, using the same mechanism that Grubisich created as CEO.  *See id.*; Gov't Sent'g Memorandum at 3, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 97.  Moreover, Grubisich remained a member of the Braskem Board of Directors for an additional period of time following his tenure as CEO, and was well aware that both "Braskem and Odebrecht continued to use [the system he created] during this period" for bribery purposes, even receiving "emails from the DSO" referencing the criminal conduct.  Gov't Sent'g Memorandum at 3, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 97.  In aggregate, the over $250 million in bribery funds attributable to Grubisich's conduct is nearly ten times more than the amount of money associated with Luis's conduct.  To the extent anyone would suggest

that, because of the limited nature of Grubisich's ultimate plea agreement, the government did not allege that he laundered any of the money involved in the massive Odebrecht bribery scheme, we note that Grubisich was originally charged by indictment with conspiracy to commit money laundering, just like Luis.  Indictment ¶¶ 47-48, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 1.

A third important difference between Luis's and Grubisich's conduct is that Luis did not know that his conduct was illegal when he first agreed to engage in the subject transactions, while Grubisich was fully aware of the illegality of his conduct from the outset.  At first, Luis believed what he was told, that the transactions were legitimate and related to a lawful business deal the Panama Government Official had with Odebrecht.  Luis operated with this mistaken belief until the fall of 2010, when he and his brother realized that they were engaging in financial transactions related to the payment of bribes.  Grubisich, on the other hand, was fully "aware that Odebrecht was paying bribes to government officials on Braskem's behalf to further Braskem's economic interests" when he began his tenure as CEO of Braskem in 2002, even prior to his own deliberate actions in furtherance of the Odebrecht bribery scheme.  Gov't Sent'g Memorandum at 2, *Grubisich*, 19 Cr. 102 (RJD), ECF No. 97.  And, in 2006, when he first became directly involved in the Odebrecht bribery scheme, Grubisich "knew" that the fraudulent "Caixa 2 system" that he authorized and  "helped create . . . did not provide any legitimate services to Braskem and were created solely" for bribery purposes. *See id.* at 2-3.  As such, Grubisich knew that his conduct was illegal for the entirety of his involvement in the Odebrecht bribery scheme.  In making this argument, Luis does not seek to avoid responsibility for his actions, which were clearly criminal, but merely makes the point that Grubisich knowingly and intentionally decided to engage in criminal behavior, while Luis unwittingly engaged in conduct that he later learned to be criminal, but failed to cease and desist when he learned of the criminal nature of the conduct.  We

respectfully submit that this is an important distinction for the Court to consider as it evaluates the comparative seriousness of these crimes and matters of sentencing disparities.

### c.    Unlike Grubisich, Luis cooperated with the government

A final yet very important distinction between the two cases is that Luis initially cooperated with the government, over a period of years.  Grubisich did not.  Luis's cooperation regarding his conduct not only led to tangible benefits for the government, but the government credited Luis's efforts and offered him a cooperation agreement.  As part of their cooperation, Luis and his brother provided the government with a veritable roadmap, including bank accounts and related companies, that directed the government to the proceeds from the Odebrecht bribery scheme connected to their conduct.  Frankly, it was Luis and his brother's cooperation that enabled the government to locate and identify the relevant Odebrecht bribery proceeds, and has led to the forfeiture of the $18,892,532.40 contemplated in Luis's plea agreement, which has been either already seized or otherwise made available for seizure.  *See* Plea Agreement ¶ 7.  The utility of efforts of cooperation warrant consideration at sentencing.  *See United States v. Escolastico*, 311 F. App'x 494, 496 (2d Cir. 2009) (explaining that it "is correct that attempted cooperation is a factor to be considered under § 3553(a)") (emphasis added); *United States v. Guzman*, 287 F. App'x 956, 958 (2d Cir. 2008) (affirming the Court's sentence that was 94 months below the bottom of the advisory Guidelines range and stating that the "record makes clear" that the Court considered the defendant's "efforts to cooperate" in making that ruling); *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007) (stating that a sentencing judge "should take under advisement . . . the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1").

We respectfully submit that, to avoid unwarranted disparities in sentencing, that the Grubisich 20-month sentence for more egregious criminal conduct must be given due consideration by the Court in formulating Luis's sentence.   In doing so, we believe that unwarranted sentencing disparities will be avoided, and just punishment given, if the Court sentences Luis to time-served, which will, practically, be a much longer sentence than that rendered in the Grubisich case.

### 7.    Because Luis is Subject to Deportation, He May Suffer Additional Consequences if Sentenced to Further Prison Time

Luis it not a United States citizen.  As such, if Luis receives a further prison sentence, he will not be able to serve that sentence in a minimum security facility (commonly referred to as a federal prison camp) where white-collar inmates are typically housed.  Inmates at federal prison camps typically have much greater freedom of movement within the facility, receive expanded access to activities and resources, and are able to serve their sentences in an environment where violence is less likely.   Low-security facilities, by comparison, where Luis would be housed because of his immigration status, are far more restrictive and dangerous.  Luis's immigration status would also make him ineligible to receive furlough or serve the final portion of his sentence in a halfway house.   Such an outcome, based solely on his immigration status and not the underlying conduct, is patently unfair and, we respectfully submit, counsels against the imposition of additional prison time in Luis's case.

In a recent sentencing decision, the Honorable Colleen McMahon imposed a non-custodial sentence on a defendant convicted of fraud, citing the fact that he is a noncitizen, and the associated prison placement limitations, as a reason for doing so:

> If I could sentence Mr. Black to a term of incarceration – a brief term of incarceration knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a

> noncitizen – and I use that term advisedly, he is not an illegal alien – but because he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. And that's not right.

Sent'g Hearing Transcript at 91:8-16, *United States v. Connolly*, 16 Cr. 0370 (CM) (S.D.N.Y. Oct. 24, 2019), ECF No. 457.

Additionally, if Luis is sentenced to additional incarceration, he will not be released upon completion of his sentence.  Instead, because of his immigration status, he will be placed in ICE custody pending deportation proceedings.  This eventuality, in effect, extends Luis's detention beyond any sentence the Court might impose.  Indeed, Judge McMahon acknowledged this period of ICE custody in her decision to give a non-citizen time-served:

> And for reasons that are incomprehensible to me, were I to sentence him to a short term of imprisonment . . . for reasons I cannot comprehend, at the end of that term he could not walk out the door and be picked up by [his attorney] and taken to the airport. He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported. And that's not right.

*Id.* at 91:17-92:3.  Accordingly, we respectfully request that the Court consider these truly unfortunate collateral consequences when deciding upon a just sentence for Luis, who intends to leave the United States forever upon the conclusion of this matter.

## CONCLUSION

In sum, we respectfully submit that, given all of the factors and circumstances discussed above, a sentence of time-served is the only appropriate and just sentence in this case.  Where a defendant has essentially served two years in jail (considering the application of good time), a time-served sentence is not a slap on the wrist, and amounts to a sentence that is fully sufficient but not greater than necessary to satisfy the purposes of sentencing.  A sentence of time-served would also avoid any unwarranted disparities in sentencing, afford adequate deterrence for future criminal conduct and promote due respect for the law.  A sentence of time-served would allow

Luis – an otherwise productive, thoughtful, and kind-hearted member of society, who made a mistake and paid the price – to attempt to rebuild his life, rejoin his family, and be the husband and parent that his wife and young children so desperately need and deserve.  Should the Court afford Luis this act of mercy, it can be assured, perhaps more than ever before, that this defendant will never darken the doorstep of the United States criminal justice system again.

Respectfully submitted,

/s/ James G. McGovern
James G. McGovern
Samuel Rackear
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
Tel.: 212-918-3000
Fax: 212-918-3100
james.mcgovern@hoganlovells.com
samuel.rackear@hoganlovells.com

*Counsel for Defendant Luis Enrique
Martinelli Linares*
