

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

271 Cadman Plaza East
Brooklyn, New York 11201

May 6, 2022

<u>By Hand and ECF</u>

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Luis Enrique Martinelli Linares
               <u>Criminal Docket No. 21-65 (RJD)</u>

Dear Judge Dearie:

        The government respectfully submits this letter in advance of the sentencing hearing scheduled for May 20, 2022, for the defendant Luis Enrique Martinelli Linares ("Luis Martinelli Linares"), and in opposition to the sentencing memorandum filed by the defendant seeking a sentence of time served.  (<u>See</u> ECF No. 55, Defendant's Sentencing Memorandum ("Def. Mem.") 2).  For the reasons set forth below, the government recommends that the Court impose a sentence of imprisonment within the Guidelines range set forth in the defendant's plea agreement, which is 108 to 135 months' imprisonment.

        On December 2, 2021, the defendant pled guilty to conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h).  This guilty plea stemmed from the defendant's role in a scheme to launder tens of millions of dollars in bribe payments on behalf of a close relative who was a high-ranking government official in Panama ("Panama Government Official"), to further conceal those bribe payments, and to ultimately spend the proceeds of that criminal conduct in the United States.

        In his sentencing memorandum, the defendant does not describe nor meaningfully address the full scope of his criminal conduct.  Instead, he argues for a sentence of time served based, in part, on his claim that there were "unique" family circumstances that led him to commit what he characterizes as an "aberra[nt]" crime, and his claim that he ultimately took responsibility for his actions and "cooperated with the government, over a period of years." (Def. Mem. 28, 39).  To the contrary, the defendant's criminal conduct was systematic and strategic—over a six-year period, the defendant and his brother and co-defendant Ricardo Alberto Martinelli Linares ("Ricardo Martinelli Linares") opened and managed a network of secret shell companies and bank accounts that they used to launder almost $28 million in bribes

from Brazilian holding company Odebrecht S.A. ("Odebrecht") on behalf of Panama Government Official and themselves; offered and provided their corrupt lobbying services to intervene on Odebrecht's behalf to bypass the protections of public ministries; invested the stolen bribe money on behalf of their family; and used millions of dollars of that money to purchase luxury goods for their own personal benefit. Moreover, the defendant's alleged cooperation was a façade—the defendant repeatedly hid crucial information from the government during the period when he was purportedly cooperating, ██████████████████ ████████████████████████████████████████████████████ and, when that attempt failed, ultimately crafted and executed an elaborate plan to flee the United States in order to escape responsibility for his crimes. The defendant is privileged, politically-connected and calculating, and both his criminal misconduct and his attempts to evade the consequences of that misconduct underscore the strong need for specific deterrence.

I.   Background

A.   The Defendant's Offense Conduct

The government's investigation in this case stems from a larger investigation into a massive bribery and money laundering scheme related to Odebrecht and its subsidiary Braskem, S.A. ("Braskem"), a Brazilian petrochemical company. Between approximately 2001 and 2016, Odebrecht paid approximately $788 million in bribes to government officials, their representatives and political parties in a number of countries in order to win business in those countries. The criminal conduct was directed by the highest levels of the company, with the bribes paid through a complex network of shell companies, off-book transactions and off-shore bank accounts. As part of the scheme, Odebrecht and its co-conspirators created and funded an elaborate, secret financial structure within the company that operated to account for and disburse bribe payments to foreign government officials and political parties. This structure ultimately became known as the "Division of Structured Operations" and effectively functioned as a stand-alone bribe department within Odebrecht.

With respect to the above-captioned case, the government's investigation determined that between approximately August 2009 and September 2015, the defendant and his brother Ricardo Martinelli Linares, together with others, conspired to facilitate the payment of bribes from Odebrecht to Panama Government Official and to conceal and spend the proceeds of that criminal conduct in the United States. During this time, and as a result of the bribes, Odebrecht won and maintained billions of dollars in over-priced contracts from the government of Panama for several of the country's highest profile public works projects ████████████████ ██████████████████████████████████████████████████████[1]

Beginning in approximately 2009, the defendant, along with Ricardo Martinelli Linares, opened and managed secret bank accounts held in the names of shell companies in foreign jurisdictions for the sole purpose of receiving, transferring, concealing and spending

---

[1] The government has filed very limited portions of this memorandum under seal, consistent with its prior filings in this case, and for the same reasons as set forth in those prior filings. (See, e.g., Gov't Letter dated November 15, 2021, ECF No. 23).

bribe payments that Odebrecht made for the benefit of Panama Government Official.  The defendant and Ricardo Martinelli Linares opened and served as the signatories on the shell company bank accounts in Switzerland that initially received the bribes, and they authorized wire transfers through a structure of shell company bank accounts to conceal and spend the bribery proceeds.  In total, the shell company bank accounts opened and controlled by the defendant and Ricardo Martinelli Linares received approximately $28 million in bribe proceeds from Odebrecht for the benefit of Panama Government Official, $19 million of which were transferred through correspondent bank accounts in the United States.  The defendant and Ricardo Martinelli Linares also conducted financial transactions to and through the United States to conceal the bribery proceeds.  Many of these financial transactions were in U.S. dollars and were made through U.S. banks, some of which were located in New York.

When foreign bankers began asking questions about the nature and source of the funds flowing into the shell company bank accounts, the defendant and Ricardo Martinelli Linares interacted with Odebrecht's top executive in Panama ("Odebrecht Panama Executive") in efforts to produce fake contracts to the foreign bankers to assuage their concerns.  And when the foreign banks ultimately closed the defendant and Ricardo Martinelli Linares's U.S. dollar accounts, they worked with Odebrecht to avoid the U.S. financial system by routing bribe payments to Euro-denominated accounts at a different bank through new intermediaries for Panama Government Official, resulting in additional bribes totaling approximately $30 million not included in the indictment.

Immediately after the election of Panama Government Official, the defendant and Ricardo Martinelli Linares requested and received a meeting with Odebrecht Panama Executive in which they offered their lobbying services and asked how they could help Odebrecht.  After additional meetings, Odebrecht Panama Executive agreed to pay the defendants $6 million in exchange for specific official actions on three major public works tenders.  The defendants opened Swiss bank accounts in the names of shell companies and provided the account information to Odebrecht Panama Executive to begin receiving the bribes.  After producing results on the first three projects, the defendants continued to contact Odebrecht Panama Executive to offer additional lobbying services, including offering to use their credentials as close family members of Panama Government Official to deliver favorable official actions from ministries and other public agencies.  They also introduced Odebrecht Panama Executive directly to key ministers appointed by Panama Government Official.  The defendants negotiated with Odebrecht Panama Executive the amounts of the additional bribes payments they received, and they told Odebrecht Panama Executive that they would use some of the funds to invest in their own private projects.

The defendant and Ricardo Martinelli Linares not only facilitated the payment of bribes from Odebrecht to Panama Government Official, but they personally benefited from the scheme.  The defendant and Ricardo Martinelli Linares also used the bribe money to make various investments in their names that benefited their family as a whole, including investing approximately $9.5 million in a cell phone service company and investing millions more in portfolios of stocks and bonds.  The defendant also purchased a $1.7 million yacht and a $1.3 million Miami condo using bribe money, while Ricardo Martinelli Linares spent hundreds of thousands of dollars in bribe money to pay off personal expenses billed to his American Express account.

3

In the course of its investigation, the government gathered the following evidence against the defendant and Ricardo Martinelli Linares: (1) foreign bank records for accounts that were used by the defendant and Ricardo Martinelli Linares to receive, conceal, and transfer the bribe payments from Odebrecht for the benefit of Panama Government Official; (2) U.S. bank records showing the use of U.S. correspondent banks for the bribe payments and the further transferring of those funds to conceal their illegal nature and source; (3) U.S. bank records and corporate receipts showing bribe proceeds that were spent in the United States; (4) email records and other corporate records from Odebrecht corroborating the scheme; (5) witness statements of former Odebrecht employees and agents involved in the scheme; (6) voluminous records from the secret electronic database that the Division of Structured Operations used to communicate and maintain records regarding the slush funds and bribes paid on behalf Odebrecht, including email communications, payment information, wire transfer requests, bank records and other records detailing the scheme and specifically the bribes that were paid to benefit Panama Government Official to bank accounts associated with the defendant and Ricardo Martinelli Linares.

B.    The Defendant's Failed Cooperation

In approximately 2018, following Odebrecht's guilty plea, the defendant and Ricardo Martinelli Linares met with the government on numerous occasions in connection with its ongoing investigations related to Odebrecht. The defendant and Ricardo Martinelli Linares also engaged in plea discussions with the government through counsel. By in or about June 2020, those plea discussions had advanced to the stage where the government and counsel for the defendant and Ricardo Martinelli Linares were exchanging drafts of plea documents and discussing the logistics of pleas to charges related to the criminal conduct detailed above.

During the period when the defendant and Ricardo Martinelli Linares were meeting with the government, neither the defendant nor Ricardo Martinelli Linares immediately took responsibility for their actions; it took several meetings before either admitted to their substantial knowledge of and participation in the bribery scheme, versus providing information about the criminal conduct of others. Moreover, the defendant and Ricardo Martinelli Linares provided key information about their own conduct very late in the series of meetings. However, as the defendant and Ricardo Martinelli Linares ultimately admitted to engaging in criminal conduct and provided information to the government that was useful in advancing its investigation, the government was—based on the information available to it at the time— prepared in 2020 to offer the defendant and Ricardo Martinelli Linares cooperation agreements.

Following the defendant and Ricardo Martinelli Linares' flight from the United States in June 2020, as detailed below, the government learned that neither the defendant nor Ricardo Martinelli Linares had engaged in the process of cooperation in good faith. Instead, counsel for the defendant and Ricardo Martinelli Linares advised the government in May 2021 that, while the defendant and Ricardo Martinelli Linares were purportedly cooperating with the government's investigation and negotiating a criminal resolution,

4

Subsequently, at the same time that the government was engaging in plea discussions with counsel, the defendant and Ricardo Martinelli Linares carefully planned to, and then, did, flee the country.

The government has also learned that the defendant and Ricardo Martinelli Linares were not forthcoming during the period of their alleged cooperation. For example, the defendant and Ricardo Martinelli Linares repeatedly advised the government that they were afraid to return to Panama due to (1) fear of retaliation from political enemies of Panama Government Official and (2) the fact that they faced criminal charges in Panama in two cases. The first case related to the Odebrecht criminal scheme (the "Odebrecht Panama Case"), and the second case related to a separate scheme in which the defendant and Ricardo Martinelli Linares were accused of receiving bribes for Panama Government Official from a company called Blue Apple that facilitated the payment of bribes from state contractors in Panama to government officials (the "Blue Apple Case"). However, unbeknownst to the government—and in preparation for their attempt to flee to Panama in June 2020—both the defendant and Ricardo Martinelli Linares applied for bail in Panama on their pending charges so that they would not be imprisoned when they returned. Specifically, on or about November 25, 2019, an attorney for the defendant and Ricardo Martinelli Linares requested that bail be set for them in both the Odebrecht Panama and Blue Apple Cases. Bail was then set at $2 million for the brothers in the Odebrecht Panama Case on or about March 6, 2020, and at $5 million for the brothers in the Blue Apple Case on or about May 20, 2020. On or about June 22, 2020, the defendant posted a total of $7 million in bail—$2 million in the Odebrecht Panama Case and $5 million in the Blue Apple Case—and days later, the defendant and Ricardo Martinelli Linares fled the United States.

The defendant and Ricardo Martinelli Linares also failed to advise the government that they had sought and obtained invalid diplomatic credentials from the Central American Parliament, also known as PARLACEN, to use during their flight.[2] And the defendant failed to advise the government before using $1 million in criminal proceeds to post bond for release from Immigration and Customs Enforcement custody in December 2018.

---

[2] PARLACEN is a governmental body made up of representatives from Guatemala, El Salvador, Honduras, Nicaragua, the Dominican Republic and Panama. The defendant and Ricardo Martinelli Linares obtained signed documents stating that they were members of PARLACEN. However, PARLACEN officials have publicly confirmed that the defendant and Ricardo Martinelli Linares were never sworn in as members of PARLACEN and would not be sworn in as members in the future. See, e.g., Aminta Bustamante and Manuel Vega Loo, *El vicepresidente del Parlacen señala que los hermanos Martinelli Linares no han sido juramentados*, La Prensa (July 7, 2020, 2:47 PM), https://www.prensa.com/politica/el-vicepresidente-del-parlacen-senala-que-los-hermanos-martinelli-linares-no-han-sido-juramentados/ (PARLACEN confirms that the defendant and Ricardo Martinelli Linares were not sworn in as deputies) and EFE Servicios, *La presidenta del Parlacen afirma que no se juramentará a los hijos de Martinelli*, La Estrella de Panamá (July 31, 2020, 7:15 AM), https://www.laestrella.com.pa/nacional/200731/presidenta-parlacen-afirma-juramentara-hijos-martinelli (PARLACEN confirms that the defendant and Ricardo Martinelli Linares will not be sworn in as deputies).

C.      The Defendant's Flight from Prosecution

        On or about June 25, 2020, the government learned that the defendant and
Ricardo Martinelli Linares had—without any notice to the government—traveled by an unknown
vessel to the Bahamas, evading United States border controls, and then boarded a private jet to
fly to Panama.  The defendant and Ricardo Martinelli Linares were accompanied on this trip by
the defendant's wife and children, confirming that the travel had been carefully planned in
advance.  However, the private jet was turned away from Panama due to COVID-19 travel
restrictions; it first landed in Costa Rica on an emergency approval, and then made an authorized
landing in El Salvador.  In the meantime, the government filed a criminal complaint charging the
defendants for the above-described criminal conduct, and arrest warrants for the defendant and
Ricardo Martinelli Linares were issued from this District.

        The defendant and Ricardo Martinelli Linares then traveled by Uber from San
Salvador, El Salvador to the border with Guatemala, which was not permitting visitors into the
country at that time due to COVID-19 travel restrictions.  The defendant and Ricardo Martinelli
Linares overcame the ban by presenting invalid diplomatic credentials at the border, falsely
representing themselves as officials of PARLACEN to gain entry to Guatemala.  While in
Guatemala, the defendant and Ricardo Martinelli Linares, who have notable and significant
political connections in Panama, were able to obtain emergency humanitarian authorization from
Panama's Minister of Health permitting them to enter the country, in spite of Panama's complete
lockdown due to the COVID-19 pandemic.  In the meantime, the U.S. government sought the
apprehension of the defendant and Ricardo Martinelli Linares in Guatemala through formal
treaty processes, and on or about July 6, 2020, both were arrested at el Aeropuerto Internacional
la Aurora in Guatemala City, Guatemala as they were attempting to board their family's private
jet which was set to take them to Panama, having obtained the emergency humanitarian
authorization.

        While incarcerated in Guatemala, the defendant and Ricardo Martinelli Linares
were initially held in an apartment rather than in a traditional prison facility.  A professional
interior designer, who had previously decorated the Miami condo described in the forfeiture
allegations of the indictment and a house owned by Panama Government Official, flew from
Miami to Guatemala and decorated the apartment with purchases from Ikea.  The defendant and
Ricardo Martinelli Linares remained in this apartment until July 2021, when they were moved by
Guatemalan officials to a more secure detention area due to information that they were planning
an escape.

        Following the defendants' arrest in Guatemala, the government submitted a full
extradition request to Guatemalan authorities.  Over the next year and a half, the defendant
fought his extradition to the United States through extended litigation, multiple recusal motions
and appeals.  Notably, some of his litigation falsely contended that he was a PARLACEN
member and was entitled to diplomatic immunity.  On May 17, 2021, after several preliminary
appeals were dismissed, the Guatemalan Fifth Criminal Sentencing Court granted the request by
the United States to extradite him.  On June 21, 2021, the Guatemalan Court of Appeals,
Criminal Branch affirmed the ruling of the Guatemalan criminal court granting extradition.  On

6

October 15, 2021, the Guatemalan Ministry of Foreign Affairs notified the United States, via diplomatic note, that the extradition was final and that the defendant was ready for surrender to the United States. On November 15, 2021, the defendant was removed to the United States.

Ricardo Martinelli Linares similarly fought his extradition to the United States, filing multiple recusal motions and other preliminary challenges. It was only after the Guatemalan Court of Appeals, Criminal Branch affirmed that the defendant would be extradited that Ricardo Martinelli Linares also consented to extradition. On November 22, 2021, the Guatemalan Ministry of Foreign Affairs notified the United States, via diplomatic note, that the extradition was final and Ricardo Martinelli Linares was ready for surrender to the United States. On December 10, 2021, Ricardo Martinelli Linares was extradited to the United States.

D.    Guilty Pleas of the Defendant, Odebrecht and Braskem

On December 21, 2016, Odebrecht and Braskem pled guilty before the Court to separate criminal informations charging each with conspiracy to violate the anti-bribery provisions of the FCPA for their involvement in the above-described bribery and money laundering scheme. See United States v. Odebrecht, 16-CR-643; United States v. Braskem, 16-CR-643.

On February 4, 2021, a grand jury sitting in the Eastern District of New York returned a five-count indictment (the "Indictment") charging the defendant and Ricardo Martinelli Linares with money laundering offenses for the above-described criminal conduct. Both were charged with one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and two substantive counts of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); the defendant was also charged with two counts of engaging in transactions in criminally derived property, in violation of 18 U.S.C. § 1957. Following their extraditions to the United States, both the defendant and Ricardo Martinelli Linares pled guilty to Count One of the Indictment in December 2021.

II.    Sentencing Guidelines and Probation's Sentence Recommendation

The government recommends that the Court adopt the below United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") calculation:

Money Laundering Conspiracy

| | |
|---|---|
| Base Offense Level (§ 2S1.1(a)(2)) | 8 |
| Plus: Loss More than $25,000,000 (§ 2B1.1(b)(1)(L)) | +22 |
| Plus: Conviction under 18 U.S.C. § 1956(h) (§ 2S1.1(b)(2)(B)) | +2 |
| Plus: Offense Involved Sophisticated Laundering (§ 2S1.1(b)(3)) | +2 |
| Acceptance of Responsibility (§§ 3E1.1(a), 3E1.1(b)): | - 3 |

7

Final Adjusted Offense Level:                                           31

As the defendant has no criminal history, he falls within Criminal History Category I, with an applicable range of imprisonment of 108 to 135 months.

As detailed in the government's letter to Probation, dated March 10, 2022, setting forth its objections to the Presentence Report ("PSR"), the above-described Guidelines calculation – which was set forth in the defendant's plea agreement and stipulated to by the defendant, who joined in the government's objections – differs from the Guidelines calculation in the PSR and addendum to the PSR, dated March 28, 2022 ("PSR Addendum"), in two respects: (1) the PSR states that the base offense level should be 12, pursuant to § 2S1.1(a)(1) (PSR ¶ 22), but it is the government's position that the base offense level should be 8, pursuant to § 2S1.1(a)(2), because the underlying offense is a violation of foreign law (specifically, Panamanian law), and no offense level for that offense can be determined; and (2) the PSR states that an enhancement for multiple bribes should be applied (PSR ¶ 23), but it is the government's position that the enhancement does not apply for the same reason.  The government maintains that its Guidelines calculation is accurate for the reasons set forth in its letter.

The Probation Department has recommended a "significant custodial" sentence of 180 months' imprisonment and a "sizable fine" of $250,000 for the defendant, and has noted that there are no "significant mitigating factors" to consider.

III.    Applicable Law

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented."  Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct; [and]

(C)      to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV.     The Appropriate Sentence

Contrary to the defendant's assertions, given the seriousness and scope of his criminal conduct, his failure to engage in the process of cooperation with the government in good faith and his flight from the United States in an attempt to escape responsibility for his actions, a substantial sentence of incarceration is warranted to provide just punishment, to promote respect for the law, and to effect adequate deterrence.

A.     The Recommended Sentence is Appropriate Given the Nature and Circumstances of the Offense and the Need for Just Punishment

The nature and seriousness of the defendant's offense counsels for a significant sentence of imprisonment in this case. The defendant spends only a fraction of his sentencing memorandum addressing his criminal conduct and, in doing so, gives no recognition to the serious consequences of his criminal conduct beyond the impact on himself and his family. He also contends that his actions "were committed in the context of a firmly entrenched, demanding and overall difficult family dynamic" and that his involvement in the scheme was not "premeditated" because he initially believed his actions to be lawful. (Def. Mem. 20). These statements fail to grasp the seriousness of the offense and, despite statements to the contrary, minimize the defendant's role in the wrongdoing. That the defendant committed his crimes with the aid of, and to benefit, family members, or agreed to join the conspiracy because of his interpersonal relationships, may serve as an explanation for his criminal conduct but does not excuse it or make it any less serious.

The defendant is 40 years old and a wealthy, well-educated, politically connected and sophisticated investor and businessman. He made a conscious, knowing decision to join, further and profit from the conspiracy. ███████████████████████████████
████████████████████████████████████████████████████████████████

████████████ With that knowledge, and their business acumen and connections, the defendant and Ricardo Martinelli Linares negotiated and coordinated bribe payments with and offered their services to Odebrecht Panama Executive, and opened multiple Swiss bank accounts in the names of shell companies to receive approximately $28 million in bribes during the conspiracy period. When Swiss banks asked too many uncomfortable questions about the source of funds and began closing down the U.S. dollar accounts, the defendant and Ricardo Martinelli Linares found substitute account holders and worked with Odebrecht to send future bribe payments to new Euro-denominated accounts at a more accommodating bank, where additional bribes totaling approximately $30 million were paid for the benefit of Panama Government Official. The defendant and Ricardo Martinelli Linares worked assiduously to maintain a good relationship with Odebrecht Panama Executive to keep the bribe money flowing by corruptly lobbying and exploiting their access to government ministers and functionaries in addition to Panama Government Official. And during and after the scheme, the defendant and Ricardo Martinelli Linares invested the bribes in various ways that benefited themselves and their families, and, as detailed above, spent the bribe money lavishly on themselves, including on real estate, yachts and to cover personal expenses.

     B.     <u>The Recommended Sentence is Appropriate to Promote Respect for the Law</u>

The corrosive effects of corruption of government officials are clear: among other harms, bribery schemes undercut fair business practices and the rule of law, siphon money away from much-needed public programs, destabilize countries and even entire regions, and facilitate human rights abuses. Only the corrupt prosper; societies, governments, and legitimate businesses lose. The United States has long recognized the harmful effects caused by bribery of foreign officials, as well as the laundering of proceeds of such schemes through the United States financial system, and sought to combat them.

The defendant was directly involved in facilitating bribes for Panama Government Official in connection with Odebrecht's involvement in public works projects, including the Panama Metro. To date, Panama has been unable to put an exact dollar amount on the country's losses, but Panamanian authorities have advised the U.S. government that they estimate that Odebrecht construction projects ████████████████████████ generated hundreds of millions of dollars in overpayments to Odebrecht from the public funds of Panama.[3] It is clear that the defendant, Ricardo Martinelli Linares, their families, their co-conspirators and Panama Government Official all profited from the illegal scheme at the expense of the Panamanian people.

---

[3] Panamanian authorities have made a request for restitution in this case. Following discussions with the U.S. government, Panamanian authorities are considering whether to withdraw this request in order to further develop evidence of loss as part of a post-sentencing request to the Department of Justice to share in the forfeited assets. Even if this request is not withdrawn before May 20, 2022, the sentencing may proceed because the Court may consider issues of restitution after sentencing.

Here, the recommended sentence would make clear that people like the defendant who aid elected officials like Panama Government Official, who cheat and steal from their own people to enrich themselves, and profit from the same, will be held accountable for their illegal conduct.

      C.     The Recommended Sentence is Appropriate to Afford Adequate Specific and General Deterrence to Similar Criminal Conduct

The need for specific deterrence in this case is great, as the defendant has repeatedly demonstrated that he believes himself to be above the law, and has consistently relied on his substantial privilege in an attempt to avoid the consequences of his actions. The brazen and prolonged nature of the defendant's initial criminal conduct demonstrated that he understood that he could operate with impunity given the power of Panama Government Official and the protection that power provided. And the defendant's behavior since the end of the conspiracy period demonstrates that he still believes this to be true, and that he has continued—and will continue—to exploit that power, and those privileges, whenever expedient and to whatever end he desires, regardless of the legality of his actions.

The circumstances of the defendant's failed cooperation and his flight from the United States are significant for this reason. As detailed above, between 2018 and 2020, the defendant and Ricardo Martinelli Linares spoke with the government on several occasions and did provide information that was helpful to the government's investigation. But it is clear in hindsight that the defendant and Ricardo Martinelli Linares never intended to take responsibility for their criminal conduct by pleading guilty. To the contrary, during the period that the defendant and Ricardo Martinelli Linares were allegedly cooperating, the defendant and Ricardo Martinelli Linares were withholding information about their own culpability and prolonging the process of getting to a guilty plea in the hopes that they could once again lean on their connections and their wealth—this time not to profit illegally, but to get out of taking responsibility for those actions. ▮▮▮▮▮. When that didn't work, and it was clear that they would have to plead guilty, they went to great lengths to set up an elaborate escape route back to Panama (while at the same time falsely telling the government that they were afraid to return there), because they apparently expected to have an easier time avoiding prosecution there.

The defendant and Ricardo Martinelli Linares arranged for bail to be set for pending charges in the Odebrecht Panama Case and the Blue Apple Case; paid bail in those cases; and obtained invalid PARLACEN credentials to use during their escape. Then, in June 2020—at the height of the COVID-19 crisis, and with most international borders closed—they arranged to avoid border checks and leave the United States with the defendant's wife and children via a private boat from Florida to the Bahamas, where they picked up a private plane to fly to Panama. When that plane was turned away from Panama due to travel restrictions, the defendant and Ricardo Martinelli Linares used their political connections to secure permission to land the jet in El Salvador. Once there, they were informed that law enforcement was looking for them, and so they left the defendant's family behind in El Salvador and took an Uber to Guatemala, using their invalid PARLACEN credentials to get across the border. The defendant and Ricardo Martinelli Linares then used their political connections once again to get the Panama

11

Minster of Health to approve a waiver to the country's COVID-19 restrictions to allow them to enter the country, and they traveled to the airport in Guatemala to try and board yet another private jet to Panama.  After they were apprehended at the Guatemala airport, they enjoyed privileged accommodations in Guatemala for a year, which were decorated by an interior designer who flew in from Miami, and were only moved to normal prison conditions after the Guatemalan authorities got information that the defendant and Ricardo Martinelli Linares were planning to escape.  During this time period, the defendant and Ricardo Martinelli Linares fought extradition through multiple rounds of appeals, including by making arguments that relied on those same invalid PARLACEN credentials.

Only after all of these efforts to leverage their wealth and political connections failed did the defendant and Ricardo Martinelli Linares agree to waive any remaining appeals and be extradited to the United States.  Based on this history, it is clear that, should the defendant have the opportunity right now to use those same privileges to avoid taking responsibility, he would.  For this reason, a significance sentence is necessary for specific deterrence.

In addition, the government also asks this Court to consider the need for general deterrence of those who would consider engaging in similar conduct under similar scenarios.  Given the strong economic incentives in taking advantage of countries with public officials willing to trade contracts for kickbacks, it is critical that there be equally strong counterincentives.  See United States v. Blech, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a) factors, including the need for specific deterrence for a recidivist, and the need for general deterrence for those who might otherwise feel that some white-collar crimes are 'game[s] worth playing.'") (quoting United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense.  This is particularly important in the area of white collar crime.  Major white collar criminals often are sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")).  The government's recommended sentence will send a strong deterrent message to other public officials and their close family members who, like the defendant, seek to sell out their country and its public resources to the highest bidder in exchange for personal wealth and luxury.

Furthermore, given that sophisticated fraud schemes, like the instant scheme with multiple international actors, are difficult to detect and prosecute, there is greater need for general deterrence.  See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the

12

punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

> D.     The Defendant's Personal History and Characteristics Do Not Outweigh the
>        Serious Nature of His Crime

A significant portion of the defendant's sentencing memorandum concerns his personal history, including his professional successes, acts of kindness and charitable contributions to others, and personal and family circumstances.  (See, e.g., Def. Mem. 1-16, 18, 26-28).  The government agrees that these factors should be considered by the Court in arriving at a sentence under 18 U.S.C. § 3553(a).  But while the defendant has had significant opportunities to help others, his actions in this regard do not set him apart from similarly situated defendants who have had the opportunity to engage in good deeds and charitable acts, face the same or similar challenges as a result of incarceration, and whose families often suffer disproportionately despite having no role in the criminal conduct.

Indeed, "[c]ivic, charitable or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."  U.S.S.G. § 5H1.11.  Instead, charitable work warrants a downward departure only where it is "present to an exceptional degree or in some other way makes the case different from the ordinary case where [charitable work] is present."  United States v. Canova, 412 F.3d 331, 358 (2d Cir. 2005).  Moreover, "more is expected" of those defendants "who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities."  United States v. Cooper, 394 F.3d 172 (3d Cir. 2005) (internal quotation marks omitted).  Cf., e.g., United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman").  These principles should similarly guide an analysis under Section 3553(a).  And here, while the defendant may have—prior to the charged criminal conduct, his attempts to obstruct the government's investigation and his flight from the United States—led an otherwise law-abiding life and engaged in charitable work, his personal and family characteristics do not absolve him of responsibility for his serious and long-lasting criminal conduct, and are not so extraordinary or exceptional as to warrant the leniency he seeks, that is, time served.

> E.     The Defendant Is Not Similarly Situated to Jose Carlos Grubisich

The defendant argues at length that a sentence other than one of time served would be unfair because this Court recently sentenced Jose Carlos Grubisich, the former Chief Executive Officer ("CEO") of Braskem, to 20 months' incarceration, and it is the defendant's contention that Grubisich's conduct was "more egregious" than the defendant's conduct.  (Def. Mem. 33-40).  Essentially, the defendant contends that because Grubisich and the defendant were both participants in different components of the overarching Odebrecht bribery and money laundering scheme; because Grubisich was the CEO of Braskem and helped create a mechanism

13

for making bribe payments, which ultimately resulted in the payment of more than $250 million in bribes by Braskem; and because the $28 million in bribes that the defendant facilitated for Panama Government Official was less than the amount paid by Braskem, the defendant should receive a similar or even lesser sentence than Grubisich. (Id.).

As an initial matter, and as the Court is aware, the government advocated for a sentence of 60 months' imprisonment for Grubisich, who pled guilty to two conspiracies pursuant to 18 U.S.C. § 371 (conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA") and conspiracy to violate the books and records provisions of the FCPA and to fail to accurate certify financial reports) that each had a maximum sentence of five years and were set to run concurrently.

Moreover, the defendant's argument is unpersuasive because while the defendant and Grubisich did participate in the same overarching bribery and money laundering scheme—which had hundreds of participants in more than a dozen countries—they are differently situated, and the defendant's own actions, both during and after the crime, make clear that a more significant sentence is warranted here. First and most significantly, following his arrest, Grubisich pled guilty and accepted responsibility for his crimes. By contrast, the defendant never truly accepted responsibility for his actions—knowing that the investigation was focused on his conduct, he carried on the façade of cooperating with the government's investigation for almost two years, all while withholding significant information about his own culpability and attempting to obstruct the government's investigation. Then, when it became clear that his attempts to evade responsibility would not be successful, he planned and executed an elaborate escape from the United States with his entire family to avoid prosecution.

Second, while Grubisich earned a salary and bonuses for his work at Braskem, which included directing others to use Braskem's funds for bribe payments, he did not personally receive or spend any bribe money. By contrast, the defendant—who did not direct or supervise others, but engaged in the criminal conduct directly—not only facilitated tens of millions of dollars in bribe payments for Panama Government Official, but personally benefited from the scheme, using those funds to make investments and spend lavishly on real estate, yachts and other personal expenses. Whereas Grubisich took corrupt actions as a corporate officer maximizing profits, the defendant took corrupt actions as a citizen arrogating public functions to himself for his personal status and luxury while selling out his country and undermining the integrity and resources of his government.

Third, the defendant's argument that he should be considered less culpable that Grubisich because he "did not know that his conduct was illegal when he first agreed to engage in the subject transactions while Grubisich was fully aware of the illegality of his conduct from the outset" is based on an incredible claim that reflects his unwillingness to take responsibility for his criminal acts. (Def. Mem. 38). Even taking the defendant at his word, by 2010—just one year into a six-year conspiracy—he was fully aware of the criminal nature of his actions, and he continued to promote and profit from the conspiracy thereafter. But from the outset the defendant jumped on the opportunity to cannily exploit his close family member's election to high office in exchange for millions of dollars in payments to his Swiss bank accounts, by

14

negotiating with the chief executive of the biggest government construction contractor operating in Panama.

Fourth, the defendant contends both that the Guidelines are unjustly "inflated" and rely too heavily on the dollar amounts associated with the charged crime (Def. Mem. 30) and then also suggests that he should get a lower sentence than Grubisich because the dollar value of the bribes he received was less than the dollar value of the bribes that Grubisich directed (id. at 37). Setting aside the tension between those two arguments, the Guidelines here do not "overstate" the seriousness of the offense—the $28 million figure that was used to calculate the Guidelines is not an intended or estimated loss, but the actual bribe amount that the defendant, Ricardo Martinelli Linares and Panama Government Official pocketed (and benefited from, in the form of investments and spending) as a result of their crimes. This distinguishes this case from others, like the Corsey and Johnson cases cited by the defendant (Def. Mem. 32), where either an intended loss amount, or an amount other than the actual gain to the defendant, was the basis for the Guidelines enhancement. Moreover, the $28 million figure also understates the scale of the defendant's corrupt acts, which included passing the baton for receiving Odebrecht bribe payments to new intermediaries who took in an additional $30 million in Euro transfers, and which resulted in over-priced Odebrecht contracts charged to public funds.

Finally, Grubisich's personal circumstances differed from those of the defendant. At the time of sentencing, Grubisich was 64 years old and had chronic coronary disease, while the defendant is far younger and in good health. Moreover, while the defendant and Grubisich both discussed how they used their wealth to further charitable works—which, as noted above, the government contends should be given limited weight by the Court—it is clear that, on balance, Grubisich's public service undertakings were far more significant and had a larger impact on the public life of his home country, including his work to help establish the equivalent of the Food and Drug Administration in Brazil, and his leadership of several non-profit organizations devoted to the defense of the rights of children, adolescents and the environment.

F.    The Defendant's BOP Classification and Potential ICE Detention Are Not Appropriate Sentencing Factors

The defendant urges the Court to depart downward based on his assertion that he would not be eligible to be designated to a "federal prison camp" due to his status as a non-citizen, and that he would potentially face additional detention in an immigration facility while awaiting deportation to Panama after completing his sentence. (Def. Mem. 40-41). As an initial matter, many foreign national non-resident defendants are subject to the exact same post-sentencing conditions.

Moreover, the Second Circuit has repeatedly rejected the same argument in the context of a downward departure for reasons that apply with equal force to the defendant's request for a variance. In United States v. Restrepo, 999 F.2d 640, 641 (2d Cir. 1993), the Second Circuit held that, although there may be rare circumstances when alienage can be considered in sentencing a defendant, a district court may *not* consider "(1) the unavailability of preferred conditions of confinement, (2) the possibility of an additional period of detention pending deportation following the completion of sentence, and (3) the effect of deportation as

15

banishment from the United States and separation from family, justified the departure." Id. at 644.

With respect to the issue of whether the defendant could be designated to a camp, the Second Circuit stated that BOP did not have a steadfast policy against doing so, but noted:

> Even if it were a steadfast policy of the Bureau to deny reassignment to relaxed-security facilities to alien prisoners who must be deported on account of their convictions, we would consider that policy an inappropriate basis for departure from the imprisonment range prescribed by the Guidelines. Assuming that § 3624(c) was intended to apply to deportable aliens, the statute does not on its face require the Bureau to ensure that all prisoners participate in such a program, but only to do so if practicable. For example, the Bureau need not reassign the prisoner to a halfway house if there is no such unit in his home state, and the absence of such a facility has been held to be an impermissible ground for departure from the Guidelines.

Id. at 645 (citation omitted). The Second Circuit concluded that, "if there is a defect in the Bureau's policy toward reassignment of deportable aliens, the appropriate way to remedy that defect would be pursuit of an action that challenges such a policy head-on, not the ad hoc granting of departures that have the effect of creating the very type of disparity in sentencing that the adoption of the Guidelines was intended to eliminate." Id. at 646.

With respect to detention while awaiting deportation, the defendant has the option to enter into a judicial order of removal ("JRO") at the time of sentencing, which would ensure his expedited removal from the United States once his sentence is complete. The government has advised the defendant of this option, and a JRO package can be prepared ahead of sentencing should the defendant so choose.

Moreover, the Second Circuit has held that such detention, which averages approximately two months, is likewise not a sufficient basis for a downward departure. "Since a deportable alien may be detained though he has not been convicted of a crime, a detention that occurs pending deportation following a convicted alien's completion of his term of imprisonment should not be viewed as a detention resulting solely from his conviction. Nor should it be viewed as part and parcel of the punishment for his criminal offense. Rather, it is part of a penalty that has traditionally been termed civil rather than punitive. Hence, in comparing the punishments meted out to an alien and to a citizen, respectively, it is inapt to measure the latter's sentence against the former's sentence plus deportation-related detention." Id. at 646 (internal cites omitted).

Even courts—principally in other circuits—who have permitted departures based on alienage have done so "where the conditions in question are 'substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense [ . . .,] and the differences in the conditions of confinement or other incidents of punishment between deportable aliens and other citizen (or nondeportable alien) defendants . . .

are not great.'" United States v. Mohammed, 315 F. Supp. 2d 354, 367 (S.D.N.Y. 2003) (quoting United States v. Guzman, 236 F.3d 830, 834 (7th Cir. 2001)) (alterations in original).  The court in Mohammed, in rejecting a departure, found that "[i]neligibility for half-way houses or minimum security institutions, the only consequences Mohammed relies upon, are not such extraordinary deprivations as to warrant a finding that the Commission did not take into account the chance that someone in this sentencing range would be subjected to them."  Id.

The Second Circuit has reaffirmed its holding in Restrepo in the post-Booker advisory Sentencing Guidelines regime.  See United States v. Duque, 256 F. App'x 436, 437-38 (2d Cir. 2007) (citing Restrepo for the proposition that "'(1) the unavailability of preferred conditions of confinement, [and] (2) the possibility of an additional period of detention pending deportation following the completion of sentence,' generally do not justify a departure from the Sentencing Guidelines range"); see also United States v. Wills, 476 F.3d 103, 107 (2d Cir. 2007) ("Now, after Booker, we reaffirm the reasoning of Restrepo and apply it to Wills's non-Guidelines sentence, which was partly based on the purported 'additional punishment' of deportation."); Rosario v. United States, 625 F. Supp. 2d 123, 130 (S.D.N.Y. 2008) (declining to exercise discretion afforded by Kimbrough v. United States, 552 U.S. 85 (2007), and holding "[i]n light of the legal authority in this Circuit, therefore, Petitioner's ineligibility for certain correctional programs due to his alien status, while unfortunate, is not an adequate basis for a downward departure of his sentence"). [4]

G.    The Time Served by the Defendant in Guatemala While Fighting Extradition is Not an Appropriate Sentencing Factor

The defendant states that the time he served in Guatemala following his arrest and during the period when he was fighting extradition to the United States "must be credited against any sentence he receives in this case."  (Def. Mem. 21).  However, the defendant improperly suggests that the "Court [should] fully credit" the defendant.  (Id. at 23 (emphasis added)).  This is incorrect; it is the Bureau of Prisons ("BOP"), and not the Court, which will apply the credit to the defendant's sentence for any time served in Guatemala, as well as the time the defendant has served in pre-trial detention in the United States since November 2021.

The operable statute is 18 U.S.C. § 3585(b), which is titled "Calculation of a term of imprisonment" and states that a defendant "shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences (1) as a result of the offense for which the sentence was imposed."  That is, a defendant shall be credited for any time spent in detention on the charges for which he or she is sentenced.  Here, the government agrees that the defendant was arrested in Guatemala on or about July 6, 2020, and was detained there until on or about November 15, 2021 on the charges in this case, and not in connection with any other charges.  As a result, it is the BOP—and not the Court—that will credit the defendant for the approximately 16 months that the defendant served in Guatemala, just as the BOP—and not the Court—would credit any defendant who spent time in pre-trial detention in the United States on the charges for which the defendant was

_____

[4] Notably, the Court declined to consider as a factor at Grubisich's sentencing the fact that he was a foreign national non-resident.

17

ultimately sentenced.  The government has conferred with counsel for the BOP to confirm that this understanding is correct.[5]

The Court should issue its sentence as it would in any other case, and the BOP will appropriately credit the defendant for the time he was detained in Guatemala.  To do otherwise would be to improperly double-count that time: for example, if the Court would otherwise have sentenced the defendant to a term of 60 months' imprisonment but took the defendant's pre-trial detention into account and only sentenced the defendant to 44 months' imprisonment, the BOP would still credit the defendant for the 16 months he served in Guatemala, and further reduce the defendant's sentence to 28 months' imprisonment (along with any further reduction for time served in the United States since November 2021).[6]

---

[5] In speaking with counsel for the BOP, it is the government's understanding that the BOP will look to the PSR to confirm the dates of the defendant's detention in Guatemala, as well as to confirm that the defendant was not held in Guatemala pursuant to charges pending in any other case.  The PSR currently clearly details the dates of incarceration in Guatemala but does not specifically state that there were no other charges on which the defendant was held.  The government has advised defense counsel of this fact, and the parties have jointly submitted language on this point to Probation for inclusion in a PSR addendum.

[6] In his sentencing memorandum, the defendant also detailed the conditions at the Metropolitan Detention Center ("MDC"), where he has been detained since November 2021. (Def. Mem. 23-25).  The defendant had an initial quarantine period pursuant to the MDC's standard procedures to combat COVID-19, which are applied to all new inmates.  The subsequent periods during which the defendant's movements were restricted were also as a result of procedures instituted for all inmates, either due to concerns about containing the spread of the Omicron variant of COVID-19, or as a result of a national lockdown instituted by the BOP at all BOP facilities.  As the defendant acknowledged, there have been no restrictions in place since February 17, 2022.  (Id.).

V.     <u>Conclusion</u>

        For the foregoing reasons, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 108 to 135 months' imprisonment. This sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. <u>See</u> U.S.S.G. § 3553(a)(2).

                                        Respectfully Submitted,

                                        BREON PEACE
                                        United States Attorney

                        By:     _____/s/_____
                                        Alixandra Smith
                                        Assistant U.S. Attorney
                                        (718) 254-6370


                                        JOSEPH S. BEEMSTERBOER
                                        Acting Chief, Fraud Section
                                        Criminal Division
                                        Department of Justice

                        By:     _____/s/_____
                                        Michael Culhane Harper
                                        Trial Attorney


                                        DEBORAH L. CONNOR
                                        Chief, Money Laundering and Asset
                                        Recovery Section
                                        Criminal Division
                                        Department of Justice

                        By:     _____/s/_____
                                        Michael Redmann
                                        Trial Attorney


cc:     Clerk of Court (RJD) (by ECF)
        Defense counsel (by ECF)